MATT MUNSON, matt@mamunsonlaw.com, Utah Bar No. 12602
Attorney for Petitioner and Plaintiff
M. A. Munson Law
970 South Sage Drive, Suite 109
Cedar City, Utah 84720
Telephone:  (435) 216-6821

DAMIEN M. SCHIFF, dms@pacificlegal.org, Cal. Bar No. 235101
(pro hac vice application pending)
JONATHAN WOOD, jw@pacificlegal.org, Cal. Bar No. 285229
(pro hac vice application pending)
Attorneys for Petitioner and Plaintiff
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF PROPERTY OWNERS,<br><br>Petitioner and Plaintiff,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL M. ASHE, in his official capacity as Director of the United States Fish and Wildlife Service; NOREEN WALSH, in her official capacity as Regional Director of the United States Fish and Wildlife Service's Mountain-Prairie Region; UNITED STATES DEPARTMENT OF THE INTERIOR; and SALLY JEWELL, in her official capacity as Secretary of the Interior,<br><br>Respondents and Defendants. | Case No.  2:13-cv-00278-EJF<br><br>**PETITION FOR REVIEW AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     Petitioner and Respondent People for the Ethical Treatment of Property Owners (PETPO) is a public interest organization, the members of which are injured by federal regulation of the Utah prairie dog.  Therefore, through this Petition and Complaint, PETPO challenges the constitutional authority of the federal government to regulate the Utah prairie dog under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

2.     PETPO's members suffer as a result of ESA regulation of the Utah prairie dog. Federal regulation makes unlawful the "take" of a prairie dog.  Such regulation prevents PETPO's members from protecting their property and remedying the other harms that prairie dog activity creates.

3.     PETPO contends that the federal government has no constitutional authority to regulate the take of Utah prairie dog on non-federal land, and thus no authority to prevent PETPO's members from protecting their property and other interests against the harms that prairie dog activity creates.  Consequently, PETPO files this suit to obtain declaratory and injunctive relief against Respondents and Defendants United States Department of Interior, *et al*. (collectively "Service"), and to invalidate regulations preventing PETPO's members from protecting their property and other interests.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 1346(a)(2) (civil action against the United States); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); and 5 U.S.C. § 702 (providing for judicial review of agency action under the Administrative Procedure Act).

5.     Venue in this district is predicated upon 5 U.S.C. § 703 and 28 U.S.C. § 1391(e), in that a substantial part of the events or omissions giving rise to this claim occurred in this district. Venue is proper in the Central Division of this District pursuant to 28 U.S.C. § 125(2).

## PARTIES

### Petitioner and Plaintiff

6.      PETPO is a membership organization that represents private property owners and other persons and entities subject to overly burdensome regulations.  PETPO was organized by Utah residents who have been injured by the regulation of the Utah prairie dog.  Its purpose is to protect their interests and to educate the public on the harms associated with regulation of the prairie dog. PETPO has advocated these interests in the political process and the media.

### Respondents and Defendants

7.      Respondent and Defendant United States Fish and Wildlife Service (Fish and Wildlife Service) is an agency of the United States government, within the Department of Interior (Department), and has been delegated responsibility for the day-to-day administration of the ESA, including enforcement of the regulations adopted pursuant to ESA Section 4(d), 16 U.S.C. § 1533(d).  As such, the Fish and Wildlife Service is responsible for enforcing the regulation prohibiting the take of the Utah prairie dog.

8.      Respondent and Defendant Daniel M. Ashe is the Director of the Fish and Wildlife Service, and is named herein and sued in his official capacity.  The Director is responsible for the administration of the ESA on behalf of the Secretary and, as such, is responsible for the enforcement of the regulation prohibiting the take of the Utah prairie dog.

9.      Respondent and Defendant Noreen Walsh is the Regional Director of the Fish and Wildlife Service's Mountain-Prairie Region, and is named herein and sued in her official capacity. The Regional Director is responsible, in part, for the administration of the ESA within the Mountain-Prairie Region.  The Mountain-Prairie Region includes Utah.  Therefore, Ms. Walsh is responsible for the enforcement of the regulation prohibiting the take of the Utah prairie dog.

10.      Respondent and Defendant Department is an agency of the United States.  Congress has charged the Department with administering the ESA for all terrestrial species.  As the

Department oversees the administration of the ESA, it is responsible for adopting the regulation prohibiting the take of the Utah prairie dog.

11.     Respondent and Defendant Sally Jewell is the Secretary of the Interior and is named herein and sued in her official capacity.   The Secretary is the official charged with enacting regulations pursuant to ESA Section 4(d), 16 U.S.C. § 1533(d).  As the Secretary is responsible for enacting these regulations, she is responsible for the adoption of the regulation prohibiting the take of the Utah prairie dog.

## LEGAL FRAMEWORK

### The Endangered Species Act

12.      The ESA grants the Service the authority to list as endangered "any species which is in danger of extinction through all or a significant portion of its range," as well as authority to list as threatened "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. §§ 1532, 1533.

13.     Section 9 of the ESA lists acts that are prohibited with respect to endangered species, including the "take" of any endangered species.  16 U.S.C. § 1538(a)(1)(B), 50 C.F.R. § 17.31(a).

14.     "Take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any of these activities.  16 U.S.C. § 1532(19).

15.     Threatened species are not automatically subject to the ESA's take prohibition. Section 4 of the Act, however, authorizes the Secretary to issue regulations extending the Section 9 prohibitions to threatened species, if the Secretary determines that it is both necessary and advisable to do so for the conservation of the species.  16 U.S.C. § 1533(d).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

16.     The Utah prairie dog is a species of rodent and one of five species of prairie dogs native to North America.  As its name suggests, the prairie dog occurs only within the state of Utah. The prairie dog's current range is southwestern Utah, including Iron, Beaver, Washington, Garfield, Wayne, Piute, Sevier, and Kane Counties.

17.     The Utah prairie dog is an omnivore that consumes plants and insects.  It lives in colonies and digs burrows and networks of tunnels for shelter and hibernation.

18.     The majority of Utah prairie dogs inhabit non-federal lands, including private lands.

19.     In 1973, the Service listed the Utah prairie dog as an endangered species.  *See* 38 Fed. Reg. 14,678 (June 4, 1973).  The Federal Register notice did not identify the threats that justified the listing.  In 1984, the Service downlisted the prairie dog to threatened status.  *See* 49 Fed. Reg. 22,330 (May 29, 1984).  At that time, the Service identified the modification of habitat, disease, and predation as threats to the survival of the species.  Since then, the Service has consistently maintained that overutilization for commercial, recreational, scientific, or educational purposes is not a threat to the prairie dog.  This is because the prairie dog has no commercial value, and is not used for commercial activity.

### *The 4(d) Rule for the Utah prairie dog*

20.     On June 2, 2011, the Service published a Notice of Proposed Rule Making announcing that it was revising its regulations of the take of the Utah prairie dog.  76 Fed. Reg. 31,906.  The notice invited comments and suggestions regarding the scope and implementation of the federal regulation of the take of the prairie dog.  Specifically, the notice stated that the Service was "proposing to revise the existing limits on take[.]"

21.     On August 2, 2012, the Service adopted a final rule ("4(d) Rule"), pursuant to ESA Section 4(d), 16 U.S.C. § 1533(d).  77 Fed. Reg. 46,158 (Aug. 2, 2012).  The rule became effective on September 4, 2012.

22.     The 4(d) Rule is a final agency action.  5 U.S.C. § 704.

23.     The 4(d) Rule revised 50 C.F.R. § 17.40(g) to read as follows, in relevant part: "Except as noted . . . , all prohibitions of § 17.31 (a) and (b) . . . apply to the Utah prairie dog."  77 Fed. Reg. at 46,182.

24.     Section 17.31(a) of Title 50 of the Code of Federal Regulations applies the protections of Section 17.21 of the same title to threatened wildlife.  Section 17.21 prohibits, among

other things, the take of endangered wildlife within the United States.  *See id*. § 17.21(c)(1).  Thus, the 4(d) Rule generally prohibits the take of prairie dog.

25.     The 4(d) Rule does authorize limited take of the Utah prairie dog.  The authorization, however, is very narrow as to the types of property on which the take of prairie dogs is allowed.  Under the 4(d) Rule, the take of the prairie dog is only permitted on agricultural lands, properties within a half-mile of conservation lands, and areas where the prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites.  77 Fed. Reg. at 46,171.  Take on all other private land is prohibited.

26.     Under the 4(d) Rule, the take of the Utah prairie dog on agricultural lands can only be allowed if the property owner first obtains a permit from the Utah Department of Wildlife Resources or another federally authorized permitting entity.  *Id.*  A permit cannot be granted until the property owner or agricultural operator demonstrates that the prairie dog negatively affects the land.  The permit applicant must then wait for the permitting entity to conduct a visual survey of the land to create a population estimate.  This population estimate determines whether the land will be eligible for a take permit.  If the surveyor determines that the spring count on the land is less than seven, the take permit must be denied.

27.     For private lands within a half-mile of conservation lands, the 4(d) Rule prevents a property owner from obtaining a permit to reduce the population of Utah prairie dogs on her land.  The  4(d) Rule defines a baseline population for each property, consisting of the highest estimated population size in the five years prior to the establishment of the conservation property, or, if these estimates are not available, the estimate from the first survey conducted after the conservation area was established.  77 Fed. Reg. at 46,172.  A permit cannot be granted if it would cause the prairie dog population on that property to fall below the baseline.  Thus, a property owner has no means of eliminating any harms associated with the preexisting prairie dog population.

28.     Under the 4(d) Rule, the take of the Utah prairie dog is allowed where it creates serious human safety hazards or disturbs the sanctity of significant human cultural or human burial

sites, but only with the Service's written approval. *Id.* This approval may only be granted if the Service determines that (i) the presence of the prairie dogs poses a serious human safety hazard or that the prairie dogs disturb significant cultural or burial sites, and (ii) these lands are unnecessary for the species' conservation. These hazards or disturbances must be clearly documented before a permit can be granted.

29. Under the 4(d) Rule, the only forms of take that can be permitted are trapping and shooting, and lethal take may only be approved as a last resort. Before a property owner may be eligible for a lethal take permit, she must demonstrate that she has exhausted non-lethal means. 77 Fed. Reg. at 46,175. The property owner or other applicant must first attempt "all practicable measures," which include constructing a prairie-dog-proof fence and trapping the animals in order to move them out of the area. The prairie-dog-proof fences are not, as their name suggests, incapable of being breached by the prairie dog. Although they often fail to keep the prairie dog from spreading, the property owner is required to construct and maintain the fences, at her own expense, to demonstrate that lethal take may be necessary.

30. While the 4(d) Rule refers to agricultural lands and lands within a half-mile of conservation lands as "exempt" from the take prohibition, these lands are subject to significant restrictions on the take of the Utah prairie dog. In addition to demonstrating that all practicable measures have been exhausted, the total permitted take in any year cannot exceed 10% of the estimated annual range-wide population. *Id.* Once this threshold is reached, no additional take can be permitted.

31. The take on agricultural lands may never exceed 7% of the estimated annual population for the recovery unit containing the agricultural lands. *Id.* The remaining take may be permitted on properties within a half-mile of conservation lands. The take on agricultural lands has exceeded 7% of the estimated annual range-wide population in at least eight years since 1985.

32.     These proportional limits apply regardless of the manner of the take.  Because the mandatory efforts to capture and transplant the Utah prairie dog constitute the take of the prairie dog, the number of lethal takes could potentially be greatly reduced.

33.     The take on agricultural lands cannot exceed one-half of a colony's estimated annual productivity (approximately 36% of the estimated population of the colony).  *Id.*  This means that, if a colony is located within a single agricultural property, the 4(d) Rule prohibits the property owner from fully removing the disruption attributable to the Utah prairie dog.  If a colony is spread across multiple agricultural parcels, one property owner's efforts to remove the prairie dog from her land will extinguish the possibility that a neighboring property owner will have an opportunity to do the same.

34.     The 4(d) Rule limits the take on agricultural lands and private property near conservation sites to between June 15 and December 31.  77 Fed. Reg. at 46,176.  However, the Utah prairie dog is also active and above the surface from March through mid-June.  Under the 4(d) Rule, property owners cannot use lethal take to address any harms associated with the prairie dog from March to mid-June.

35.     There is no numeric or percentage limitation on the take of the Utah prairie dog on lands where it poses a serious human safety hazard or disturbs the sanctity of significant human cultural or burial sites.  The property owner, however, must exhaust the other measures identified in the 4(d) Rule, *viz.*, the construction of a prairie dog fence and non-lethal translocation.  *Id.*  The property owner must demonstrate that she has attempted both non-lethal means, to no avail, before she is eligible for written permission from the Service.

36.     The 4(d) Rule exempts any incidental take resulting from some, but not all, agricultural practices.  77 Fed. Reg. at 46,177.  The exempt practices include plowing to depths shallower than 18 inches, discing, harrowing, irrigating, moving, harvesting, and bailing, as long as these activities are not intended to eradicate Utah prairie dogs.

37.     A property is only eligible for the agricultural practices exemption if the land is classified as agricultural under the Utah Farmland Assessment Act.  77 Fed. Reg. at 46,178.  To qualify, the property must be capable of producing crops, must be managed with a reasonable expectation of profit, must be larger than five contiguous acres, must meet average annual production requirements, and must have been devoted to agricultural use for at least two successive years before the application for agricultural land status.  This means that a private property owner who cannot use her property for other purposes because of the Utah prairie dog cannot immediately take advantage of the agricultural practices exemption.  Rather, the property owner must find a way to operate a profitable farm without causing the take of the prairie dog for two consecutive years.  Because plowing the land is likely to result in the take of the prairie dog, this may prove impossible.

38.     The 4(d) Rule for the Utah prairie dog affects many of the members of PETPO, including the Cedar City Corporation, Brenda Webster, Daniel Webster, Dean Lamoreaux, Kathy Lamoreaux, Bruce Hughes, Mark Bradshaw, Dave Morris, Les Childs, and Boyd Hall.  For each of these members, the inability to address the problems of the prairie dog interferes with their property and other important interests.  They are each directly injured by the 4(d) Rules requirement that they obtain a permit, or satisfy any other conditions, before taking the prairie dog on non-federal land.

### *Cedar City Corporation*

39.     Cedar City Corporation is the municipal government for Cedar City, Utah, and a member of PETPO.

40.     The city owns and operates recreational areas for its residents, including sports fields.  Some of these fields have been infested by the Utah prairie dog.  The prairie dog digs burrows and other holes that create a safety hazard.  Residents, particularly children, are at risk of sustaining injuries due to burrow cave-ins and uneven ground.  To protect patrons, the city must fence off dangerous areas, limiting the space available for recreation.

41.     The city owns and operates a municipal golf course.  The Utah prairie dog increases the costs of maintaining the course.  Prairie dogs chew wiring for the irrigation system, requiring

it to be repaired or replaced.  The driving range has been riddled with prairie dog holes, making it more difficult to retrieve balls and maintain the range.  The holes and burrows dug by the prairie dog damage the course's mowing equipment.  The prairie dog causes the course grounds to be less suitable for golf.  The additional maintenance, irrigation, and equipment costs average $10,000 to $12,000 per year.  The holes and burrows are also a safety hazard for course employees and guests. These hazards and the other effects of the prairie dog have caused the course to lose business.

42.     The city owns Cedar City Regional Airport.  Utah prairie dog mounds create a severe hazard in the runway and taxiway safety zones.  These zones must be flat, in case a plane has a mechanical problem and must leave the paved runway.  The mounds pose a continual risk to aircraft and passengers.

43.      Utah prairie dog mounds and burrows create a constant need for additional maintenance of the airport.  For example, from March to November, airport staff must spend three to four hours a day grading and leveling the ruts and mounds that the prairie dog digs.  The city had to purchase a $4,000 box scraper to assist in this effort.  The additional demand for tractor time and diesel fuel has also increased the airport's maintenance costs.

44.     In 2009, the Federal Aviation Administration and the Service negotiated a habitat plan for airports containing the Utah prairie dog.  Compliance with this plan cost the airport $325,000, preventing badly needed improvements.

45.     The city owns and operates the Cedar City Cemetery.  Utah prairie dogs have been present in Cedar City Cemetery for at least 12 years.  The prairie dogs interfere with the maintenance of the cemetery.  For example, their burrowing damages the asphalt roads of the cemetery.  Because of the declining condition of these roads, the city's equipment and vehicles have been damaged and require costly repairs. The prairie dog also causes the surface of the ground to be uneven, damaging the city's mowing equipment.  The increased maintenance costs, along with the delays associated with equipment repairs, have made it more difficult to keep the cemetery well-manicured.

46.     The city wishes to operate a cemetery that is a pleasant and peaceful place of reflection for people visiting the remains of their deceased loved ones.  But the Utah prairie dogs are a safety hazard for visitors to the cemetery.  Their burrowing creates an uneven ground on which it is more difficult to safely traverse, particularly for the elderly and disabled.

47.     The Utah prairie dog threatens the peaceful operation of the cemetery and the sanctity of the grave sites.  Recently, a funeral service was interrupted by a prairie dog that scampered around the service and began barking loudly and incessantly.  This disturbance caused great stress to the unfortunate widow.  The prairie dogs also destroy remembrances left at grave sites.  For example, the prairie dogs eat flowers and other plants that visitors place near tombstones.  Also, the city wishes to expand the cemetery to provide much needed space for additional grave sites.  This expansion, however, has been prevented because the prairie dog has infested the area.

48.     The 4(d) Rule restrictions on the take of the Utah prairie dog prevent the city from protecting the cemetery, and its other properties, from the negative effects of the prairie dog.  The city has spent approximately $3,000 per year on building fences and other maintenance designed to keep the prairie dog at bay.  These efforts have been unsuccessful.  Each time a fence fails, the city has been told to modify it before it will be eligible for a lethal take exemption.

49.     The city fears imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should it choose to protect its interests, and therefore has refrained and will continue to refrain from otherwise acting to protect its interests.

50.     Therefore, the take prohibition for the Utah prairie dog continuously injures the city.

### Brenda and Daniel Webster

51.     Brenda Webster and her son, Daniel Webster, are members of PETPO and residents of Cedar City, Utah.

52.     Brenda Webster is a widow.  Dan Webster, Brenda's late husband and Daniel's father, is buried in the Cedar City Cemetery.  The Utah prairie dog has transformed Dan Webster's tranquil final resting place into one that is disturbed and noisy.  The prairie dogs occupy an area near

the grave site.  They dig up the earth around the graves, leaving ruts and mounds.  This makes the cemetery around Dan Webster's grave site unsightly and makes it more difficult for Brenda Webster, Daniel Webster, or any other visitor to traverse the land to visit the grave site.

53.     The Utah prairie dogs threaten the desecration of graves, including Dan Webster's, if they cannot be effectively removed and kept from the Cedar City Cemetery.  This threat causes Brenda and Daniel Webster distress.

54.     Brenda and Daniel Webster fear imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should they choose to protect their interests, and therefore have refrained and will continue to refrain from otherwise acting to protect their interests.

55.     Therefore, the prohibition of take for the Utah prairie dog continuously injures Brenda and Daniel Webster.

### Dean and Kathy Lamoreaux

56.     Dean and Kathy Lamoreaux are members of PETPO and residents of Cedar City.

57.     The Lamoreauxs purchased a 200-acre farm in Cedar City in 1990.  Their family has actively farmed the land since purchasing it.  When they purchased the property, there were no Utah prairie dogs on the land.  In the mid 1990s, the prairie dog began to appear on the property.

58.     The Lamoreauxs have suffered damage to their farming equipment because of the inability to control the Utah prairie dog.  They have had to repair their swathers, balers, and bale wagons because of cave-ins and prairie dog mounds.  For example, when their baler was stuck due to the caving in of a prairie dog burrow, the Lamoreauxs had to hire someone to lift the equipment out of the hole.  Any less expensive means of extracting the equipment would have caused it to break.  Also, the mounds created by the prairie dog break the knives of the Lamoreauxs' swather.  These costly repairs and the associated delays severely burden the Lamoreauxs' ability to operate their farm.

59.     Although many of the Lamoreaux family's farming activities are within the agricultural exemption, *see supra* ¶¶ 36-37 (describing the 4(d) Rule's agricultural exemption, this

exemption merely allows the family to engage in farming activities.  It will not enable the family to protect its equipment from damage by the Utah prairie dogs.  Under the 4(d) Rule, the Lamoreauxs' farm is subject to the 7% total take limitation.  Consequently, the Lamoreauxs must construct a fence and attempt to transplant the prairie dogs on their property before they can become eligible for a permit to engage in the lethal take of the prairie dog.

60.     The Lamoreauxs fear imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should they choose to protect their interests, and therefore have refrained and will continue to refrain from otherwise acting to protect their interests.

61.     Therefore, the take prohibition for the Utah prairie dog continuously injures the Lamoreauxs.

### Bruce Hughes

62.     Bruce Hughes is a member of PETPO and a resident of Cedar City, Utah.

63.     Mr. Hughes is a member of a partnership that owns 3.4 acres in Cedar City.  Several years ago, Utah prairie dogs were driven onto the property.  When the real estate market was more robust, Mr. Hughes and his partners attempted to develop the property.  They were prevented from obtaining a building permit because the prairie dog was on their property.  The real estate market has since declined and Mr. Hughes has lost the opportunity to earn the profits on his investment that he would have enjoyed if not for the federal regulation of the prairie dog.

64.     When Mr. Hughes and his partners originally sought a building permit, there were over 50 Utah prairie dogs on the property.  They were told that they could only remove the prairie dogs by signing up for the county's "take" list.  The county, however, was only allowed 72 takes per year and over 70 property owners were already on the list.  Moreover, each property on the list was only allowed 10 takes per year.  Given the large number of prairie dogs on the partners' parcel, they are not able to obtain relief through the "take" list.

65.     Mr. Hughes and his partners continue to own the parcel.  Because of the presence of the Utah prairie dogs, and the take restriction, they have been unable to sell or develop the property.

66. Mr. Hughes and his partners cannot adequately protect their property from the Utah prairie dogs under the 4(d) Rule. Because the property is more than a half-mile from conservation land, it is categorically ineligible for a take permit. Even if conservation land were established within a half-mile of the property, the number of prairie dogs could not be reduced below the baseline. This limitation would prevent Mr. Hughes from remedying the negative effects of the existing population.

67. Mr. Hughes fears imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should he choose to protect his interests, and therefore has refrained and will continue to refrain from otherwise acting to protect his interests.

68. Therefore, the take prohibition for the Utah prairie dog continuously injures Mr. Hughes.

### Mark Bradshaw

69. Mark Bradshaw is a member of PETPO and a resident of Cedar City.

70. Mark Bradshaw owns property in Cedar City that he wishes to develop into a car dealership. Mr. Bradshaw's plans have been frustrated by the invasion of the Utah prairie dog. The prairie dogs on the property prevent Mr. Morris from developing the property. Also, he has not been able to sell or otherwise use the property because of the presence of the prairie dog.

71. Mr. Bradshaw fears imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should he choose to protect his interests, and therefore has refrained and will continue to refrain from otherwise acting to protect his interests.

72. Therefore, the take prohibition for the Utah prairie dog continuously injures Mr. Bradshaw.

### Dave Morris

73. Dave Morris is a member of PETPO and a resident of Cedar City.

74. Dave Morris also owns property in Cedar City that he intends to develop into a car dealership. Mr. Morris' plans have been frustrated by the invasion of the Utah prairie dog. The

prairie dog's presence on the property has prevented him from developing his property. He has not been able to sell or otherwise use the property because of the presence of the prairie dog.

75.     Mr. Morris fears imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should he choose to protect his interests, and therefore has refrained and will continue to refrain from otherwise acting to protect his interests.

76.     Therefore, the take prohibition for the Utah prairie dog continuously injures Mr. Morris.

### Les Childs

77.     Les Childs is a member of PETPO and a resident of Sandy, Utah. Mr. Childs is the owner and developer of the Equestrian Pointe Subdivision in Cedar City.

78.     The Utah prairie dog interferes with Mr. Child's ability to sell lots in the subdivision. When prairie dogs invade an unbuilt lot, the lot loses all value because it cannot be improved unless the prairie dogs are first removed, and the restrictions on removal are too severe for removal to be economically feasible.

79.     In 2009, the take prohibition for the Utah prairie dog frustrated the sale of two lots, worth over $100,000 each. The potential purchasers did not complete the transaction because they could not take the risk that the prairie dog would invade their lots before they were able to construct their homes. Other lots are more difficult to sell because realtors must warn potential buyers of the risk that the prairie dog will prevent home construction.

80.     Two one-acre lots in the subdivision were developed and sold, without any Utah prairie dogs present. In 2010, hundreds of prairie dogs invaded these two lots. The number of prairie dogs on each lot is too large for removal to be an economically feasible means of recovering the right to build on these lots. Because these lots cannot be developed, they have no economic value. The loss of the value of these lots also scares off potential buyers of other lots in the subdivision, causing a general decline in lot values.

81.     The construction of Utah prairie dog fences around Equestrian Pointe costs in excess of $10,000.  The fences have not succeeded in preventing the movement of the prairie dog onto parcels that were intended to be developed.  The fences add to the unsightly blight attributable to the prairie dog.  Prairie dog mounds and burrows also contribute to blight.  The effects of the prairie dog on the subdivision's appearance negatively affect  the value of every lot.

82.     The take prohibition prevents Les Childs from eliminating the harmful effects of the Utah prairie dog at Equestrian Pointe.  Because the property is more than a half-mile from conservation land, it is categorically ineligible for a take permit.  Even if conservation land were established within a half-mile of the property, the number of prairie dogs could not be reduced below the baseline.  However, the existing population is already harming Mr. Childs' property.  Because the 4(d) Rule would not permit Mr. Childs to reduce the population below the baseline, he cannot protect his property from the prairie dog.

83.     Mr. Childs fears imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should he choose to protect his interests, and therefore has refrained and will continue to refrain from otherwise acting to protect his interests.

84.     Therefore, the prohibition of take for the Utah prairie dog continuously injures Mr. Childs.

### Boyd Hall

85.     Boyd Hall is a member of PETPO.

86.     Boyd Hall owns several subdivision lots in Cedar Valley, Utah, that he intends to develop.  These lots have been overrun by Utah prairie dogs and cannot be developed under the 4(d) Rule.  In order to develop these lots, Mr. Hall would have to pay a take fee, demonstrate the futility of non-lethal methods on his property, and wait for permission to commit a lethal take.  These requirements make development economically infeasible.  To the extent that Mr. Hall is eligible for take permits, they would only make it possible for him to keep the existing population

from growing. The pre-conservation land population—the baseline—would continue to prevent development of the lots.

87.     Mr. Hall fears imminent enforcement and prosecution from the Service for illegal take of the Utah prairie dog should he choose to protect his interests, and therefore has refrained and will continue to refrain from otherwise acting to protect his interests.

88.     Therefore, the take prohibition for the Utah prairie dog continuously injures Mr. Hall.

## SPECIFIC ALLEGATIONS THAT SUPPORT INJUNCTIVE RELIEF

89.     All preceding paragraphs are realleged and incorporated herein by reference.

90.     If an injunction does not issue enjoining the Service from enforcing the take prohibition for the Utah prairie dog, PETPO's members will be irreparably harmed by being subject to unnecessary and costly restrictions on their ability to protect their property and other interests.

91.     PETPO's members have no plain, speedy, and adequate remedy at law.

92.     PETPO's action is ripe and timely.

93.     If not enjoined by this Court, the Service will continue to enforce and act in reliance upon the take prohibition for the Utah prairie dog in derogation of the rights of PETPO's members.

## SPECIFIC ALLEGATIONS THAT SUPPORT DECLARATORY RELIEF

94.     All preceding paragraphs are realleged and incorporated herein by reference.

95.     An actual and substantial controversy exists between PETPO and the Service over the Service's duty to comply with the United States Constitution, the Endangered Species Act, and the Administrative Procedure Act in issuing regulations limiting the take of the Utah prairie dog.

96.     This case is justiciable because the Service's failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to PETPO's members, by subjecting them to illegal and costly restrictions on their rights to use and enjoy their property and other protected interests. PETPO, and its members, have a vital interest in knowing whether the take prohibition for the Utah prairie dog is constitutionally and statutorily valid.

97.     Declaratory relief is, therefore, appropriate to resolve this controversy.

## FIRST CLAIM FOR RELIEF

### Petition for Review of Final Agency Action

### Prohibiting the Take of the Utah Prairie Dog in Violation of the APA

### (5 U.S.C. § 706)

98.     The preceding paragraphs are realleged and incorporated herein by reference.

99.     Under the Administrative Procedure Act, an agency action, finding, or conclusion is invalid if (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (b) contrary to any constitutional right, power, privilege or immunity, (c) inconsistent with any statute, (d) adopted without compliance with required procedures, (e) unsupported by substantial evidence, or (f) unwarranted by the facts (if reviewed de novo).  5 U.S.C. § 706.

100.     An agency action that would extend an act of Congress beyond Congress' enumerated powers is contrary to a constitutional right, power, privilege, or immunity and not in accordance with law.

101.     The United States Constitution grants Congress the power to regulate commerce among the several states.

102.     Pursuant to the Commerce Clause, Congress may regulate economic activities that substantially affect interstate commerce.  *United States v. Morrison*, 529 U.S. 598, 608-09 (2000). Congress may also regulate non-economic activities if such regulation is necessary to vindicate an otherwise valid comprehensive economic regulatory scheme. *Gonzales v. Raich*, 545 U.S. 1 (2005).

103.     Pursuant to the ESA, the Service has classified the Utah prairie dog as a threatened species.  Also under the Act's aegis, the Service has generally prohibited the take of prairie dog wherever found, including non-federal property.

104.     The Utah prairie dog is found only within the state of Utah.

105.     The Utah prairie dog has no commercial value.  The Service has not made any findings that the take of the prairie dog substantially affects interstate commerce.  Rather, the

Service has consistently concluded that the prairie dog is not used commercially and is not at risk due to commercial overutilization.

106.     The take of the Utah prairie dog does not substantially affect interstate commerce.

107.     Takes of the Utah prairie dog, aggregated to include the entire species, do not substantially affect interstate commerce.

108.     The take of the Utah prairie dog is categorically non-economic activity.

109.     The Endangered Species Act is not a comprehensive economic regulatory scheme. The inability to regulate the take of Utah prairie dogs would not frustrate the Service's ability to regulate the take of commercially valuable species or species within the channels of commerce. Thus, the regulation of take of prairie dog is unnecessary to vindicate any comprehensive economic regulatory scheme.

110.     No enumerated power supports the regulation of the take of the Utah prairie dog on non-federal land.

111.     The regulation of the take of the Utah prairie dog on non-federal land is neither necessary nor proper to the exercise of any power of the federal government.

112.     Therefore, the regulation of the take of the Utah prairie dog on non-federal land is contrary to constitutional right, power, privilege, or immunity, 5 U.S.C. § 706(2)(B), as well as arbitrary, capricious, and contrary to law, 5 U.S.C. § 706(2)(A).  The Service has no authority to require PETPO's members to obtain a permit, or satisfy any other conditions, before taking the prairie dog on non-federal land.

**SECOND CLAIM FOR RELIEF**

**Declaratory and Injunctive Relief for the**

**Adoption and Enforcement of the Prohibition of Take**

**for the Utah prairie dog in Excess of Congress' Enumerated Powers**

**(U.S. Const. amend. X)**

113.     All preceding paragraphs are realleged and incorporated by reference.

114.     The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." The Amendment protects states and persons from actions taken by the federal government in excess of its enumerated powers. *Bond v. United States*, 131 S. Ct. 2355 (2011).

115.     The United States Constitution grants Congress the power to regulate commerce among the several states.

116.     Pursuant to the Commerce Clause, Congress may regulate economic activities that substantially affect interstate commerce. *United States v. Morrison*, 529 U.S. 598, 608-09 (2000). Congress may also regulate non-economic activities if such regulation is necessary to vindicate an otherwise valid comprehensive economic regulatory scheme. *Gonzales v. Raich*, 545 U.S. 1 (2005).

117.     Pursuant to the ESA, the Service has classified the Utah prairie dog as a threatened species. Also under the Act's aegis, the Service has generally prohibited the take of prairie dog wherever found, including non-federal property.

118.     The Utah prairie dog is found only within the state of Utah.

119.     The Utah prairie dog has no commercial value. The Service has not made any findings that the take of the prairie dog substantially affects interstate commerce. Rather, the Service has consistently concluded that the prairie dog is not used commercially and is not at risk due to commercial overutilization.

120.     The take of the Utah prairie dog does not substantially affect interstate commerce.

121.    Takes of the Utah prairie dog, aggregated to include the entire species, do not substantially affect interstate commerce.

122.    The take of the Utah prairie dog is categorically non-economic activity.

123.    The Endangered Species Act is not a comprehensive economic regulatory scheme. The inability to regulate the take of the Utah prairie dog would not frustrate the Service's ability to regulate the take of commercially valuable species or species within the channels of commerce. Thus, the regulation of the take of the prairie dog is unnecessary to vindicate any comprehensive economic regulatory scheme.

124.    No enumerated power supports the regulation of the take of the Utah prairie dog on non-federal land.

125.    The prohibition of the take of the Utah prairie dog on non-federal land is neither necessary nor proper to the exercise of any power of the federal government.

126.    Therefore, the prohibition of the take of the Utah prairie dog on non-federal land violates the Tenth Amendment and is unconstitutional.

**PRAYER FOR RELIEF**

Wherefore, PETPO prays for judgment against the Service as follows:

1.    for a declaration that the prohibition of the take of the Utah prairie dog on non-federal land is invalid under the Administrative Procedure Act, 5 U.S.C. § 706, because it is inconsistent with constitutional right, power, privilege, or immunity and not in accordance with law;

2.    for a declaration that the prohibition of the take of the Utah prairie dog is an invalid exercise of delegated legislative power under the United States Constitution, and that the Service is without authority to prohibit the take of the prairie dog on non-federal land;

3.    for a permanent injunction preventing the Service from enforcing the prohibition of the take of the Utah prairie dog on non-federal land;

4.      for an award of PETPO's costs of litigation, including, but not limited to, reasonable attorneys' fees and expert witness fees, and fees and costs pursuant to 28 U.S.C. § 2412, or other applicable authority; and

5.      for such other relief as the Court may deem just and proper.

DATED:  April 17, 2013.

Respectfully submitted,

MATT MUNSON
DAMIEN M. SCHIFF
(pro hac vice application pending)
JONATHAN WOOD
(pro hac vice application pending)


By /s/ Matt Munson
              MATT MUNSON

Attorneys for Petitioner and Plaintiff