IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF PROPERTY OWNERS,<br><br>Petitioner and Plaintiff,<br><br>vs.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE; et al.,<br><br>Respondents and Defendants,<br><br>and<br><br>FRIENDS OF ANIMALS,<br>Respondent-Intervenor. | MEMORANDUM DECISION AND ORDER<br><br><br><br><br>Case No. 2:13-cv-00278-DB<br>Judge Dee Benson |

Plaintiff People for the Ethical Treatment of Property Owners ("PETPO") filed the instant lawsuit against United States Fish and Wildlife Service, Daniel M. Ashe, in his official capacity as Director of the United States Fish and Wildlife Service, Noreen Walsh, in her official capacity as Regional Director of the United States Fish and Wildlife Service's Mountain Prairie Region, the United States Department of the Interior, and Sally Jewell, in her official capacity as Secretary of the Interior (collectively "Defendants"), challenging the constitutional authority of the federal government to regulate take of the Utah prairie dog on non-federal land under the

1

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.  Friends of Animals ("FoA") has intervened as a Defendant.  The case is now before the court on the parties' opposing motions for summary judgment.  The parties agree that there are no genuine issues of material fact that would preclude the court from ruling, as a matter of law, on the merits of this case.

The court heard oral argument on the motion and cross-motion on September 11, 2014.  At the hearing, PETPO was represented by Jonathon C. Wood.  Defendants were represented by Mary Hollingsworth.  FoA was represented by Michael Harris.  Prior to the hearing, the court considered the memoranda and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to the motions.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

The Utah prairie dog is an animal whose population is located exclusively in southwestern Utah.  (FWS' Mot. for Summ. J. at 6.)  Nevertheless, the federal government began protecting the prairie dog as an endangered species in 1973, pursuant to the Endangered Species Conservation Act of 1969.  38 Fed. Reg. 13678.

Later that same year, Congress replaced the Endangered Species Conservation Act with the ESA.  The ESA was enacted by Congress "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  A species is considered "endangered" if it is "in danger of extinction throughout all or

a significant portion of its range," and is considered "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532 (6), (20). Section 9 of the ESA protects endangered species from unauthorized "take," possession, delivery, transportation, receipt, or sale. Id. § 1538(a)(1)(A)-(F). Section 4(d) of the ESA authorizes the Secretary of the Interior to "issue such regulations as he deems necessary and advisable to provide for the conservation of" threatened species. Id. § 1533(d). This is often done by creating a special section 4(d) rule to protect the particular threatened species. (FWS' Mot. for Summ. J. at 5-6.)

On January 4, 1974, the Utah prairie dog's listing as an endangered species was incorporated into the ESA. In 1984, the U.S. Fish and Wildlife Service ("FWS") reclassified the Utah prairie dog as a threatened species and issued a special section 4(d) rule to govern the protection of that animal. 49 Fed. Reg. 22330. The rule authorized the "take" of 5,000 prairie dogs annually on certain lands in Iron County, as long as the takes were consistent with Utah State law. Id. at 22331. The rule was amended in 1991 to increase the limit of authorized take to 6,000 prairie dogs annually and to expand the geographic scope of authorized take to include all private lands within the region. (FWS' Mot. for Summ. J. at 8.)

On August 2, 2012, the FWS revised the special rule to its current form. 50 C.F.R. § 17.40(g) (the "rule".) Under this revision, take of the Utah prairie dog is authorized only by permit and only on "agricultural lands, [private property] within [.5 miles] of conservation lands, and areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites." Id. The rule does not permit take of the Utah

prairie dog on any federal land.[1]  Id.

In context of the ESA, the term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any endangered or threatened animal, as listed in the ESA. 15 U.S.C. § 1532(19).  Furthermore, the term "harm" within the definition of "take" includes any "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.  Consequently, where no permit has been issued, the rule prevents anyone from undertaking any activity that would injure or kill a Utah prairie dog or significantly impair its habitat.

PETPO filed this action on April 18, 2013, alleging under the Administrative Procedures Act ("APA") that FWA's special rule governing the Utah prairie dog is "contrary to a constitutional right, power, privilege, or immunity and not in accordance with law."  (Compl. ¶¶ 99-100.)  PETPO asserts that Congress does not have the authority to regulate take of the Utah prairie dog on non-federal land.  Specifically, PETPO argues that the Commerce Clause and the Necessary and Proper Clause fail to authorize such regulation because the Utah prairie dog is located exclusively within the state of Utah and because take of the prairie dog does not substantially affect interstate commerce.  (Id. ¶¶ 101-110.)  PETPO subsequently moved for summary judgement.

Defendants responded by filing a cross-motion for summary judgment, contending that

---

[1] However, the authorization of takes in "areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites," does not exempt federal land.  Id. at (g)(2).

PETPO lacks standing to bring this case because its injuries will not necessarily be redressed by a final decision in its favor. Defendants further contend that even if PETPO has standing, Congress is authorized to regulate the Utah prairie dog through the Commerce Clause and the Necessary and Proper Clause. (FWA's Mot. for Summ. J. at 20.)

Defendants assert that every United States circuit court of appeals that has heard a similar case has upheld Congress' authority to regulate the take of purely intrastate species. See San Luis & Delta-Mendota Water Authority v. Salazar, 638 F.3d 1163 (9th Cir. 2011); Alabama-Tombigbee Rivers Coalition v. Kempthorne, 477 F.3d 1250 (11th Cir. 2007); GDF Realty Investments, LTD. v. Norton, 326 F.3d 622 (5th Cir. 2003); Gibbs v. Babbitt, 214 F.3d 483 (4th Cir. 2000); Nat'l Ass'n of Home Builders v. Babbit, 130 F.3d 1041 (D.C. Cir. 1997). Relying on these cases, Defendants present three arguments in support of congressional authority for the special rule governing take of the Utah prairie dog.

First, the rule has a substantial effect on interstate commerce because many of the proposed activities that have been prohibited by the rule are commercial or economic in nature. For example, Defendants' demonstrate that the rule has prevented several proposed agricultural activities and land development plans. (Id. at 31-32.)

Second, Defendants argue that because the Utah prairie dog has biological and commercial value, any takes of the animal have a substantial effect on interstate commerce. As far as biological value, Defendants argue that prairie dogs perform many functions that contribute to the ecosystem. For example, prairie dogs improve the soil where they burrow and "golden eagles, large hawks and bobcats, are . . . known to prey on prairie dogs." (Id. at 29.) As

far as commercial value, Defendants assert that the prairie dog attracts some interstate tourism. (Id. at 29-30.)  FoA additionally emphasizes that the prairie dog has been the subject of scientific studies and commercially published books.  (FoA Mot. for Summ. J. at 12-15.)

Finally, Defendants argue that the Necessary and Proper Clause authorizes special rule 4(d) because the regulation of takes of Utah prairie dogs is essential to the economic scheme of the ESA.  Defendants assert that even if regulation of the take of the Utah prairie dog is not essential to the economic scheme of the ESA on its own, it becomes essential when aggregated with the regulation of take of other intrastate non-commercial species: "Excluding from protection all intrastate species–68% of all listed species–or even all species with no current commercial or economic value, would substantially frustrate the ESA's comprehensive scheme to protect listed species."  (FWA's Mot. for Summ. J. at 40.)

Asserting that Congress is thus authorized to regulate the take of the Utah prairie dog on non-federal lands, Defendants ask the court to grant their cross-motion for summary judgment and to deny PETPO's motion for summary judgment.

## DISCUSSION

### Standing

Defendants argue that the court should grant its cross-motion for summary judgment because PETPO lacks judicial standing to bring this case.  An organization has standing to bring a suit on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

Friends of the Earth, Inc. V. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000) (citation omitted.) The organization's members would have standing in their own right only if they can demonstrate three elements: injury in fact, traceability, and redressability. In this case, Defendants refute PETPO's standing on the grounds that "PETPO cannot establish the third element of standing," (e.g. redressability).[2]

To satisfy the redressability requirement, PETPO must show that "there is a least a 'substantial likelihood' that the relief requested will redress the injury claimed . . . ." Baca v. King, 92 F.3d 1031, 1036 (10th Cir. 2012) (citation omitted). Defendants claim that PETPO fails to make this showing because there are other laws in place that will prevent the organization's members from engaging in activities that would "take" prairie dogs even if the court rules that special rule 4(d) is not a valid exercise of Congressional authority. (FWS' Mot. for Summ. J. at 13-14.) Defendants specifically argue that even if special rule 4(d) is struck down as unconstitutional, the limitations imposed by two laws would still apply: Utah Admin. Code R657-19-6, which is the state law governing the take of prairie dogs; and, 50 C.F.R. ¶ 17.31 ("general rule 4(d)"), which is the general federal law governing the take of threatened animals. Both of these laws would act as barriers to prevent PETPO's members from carrying out potential construction plans and other activities.

---

[2]To satisfy the first two elements, PETPO asserts that its members have been injured by this rule in a variety of ways. For example, some of its members "are no longer eligible to obtain take permits under the special 4(d) rule because the 2012 revision does not allow permits to be issued for private property other than" the land listed in the rule. (Plaintiff's Mot. for Summ. J. at 12.) PETPO emphasizes that the rule consequently "prevents these property owners from constructing single-family homes, developing car dealerships, and pursuing other commercial development on their private property," because such activities would constitute an unauthorized take of the Utah prairie dog under the rule. (Id. (internal citations omitted).)

PETPO responds by asserting that "a plaintiff can seek redress even if the challenged regulation is one of multiple obstacles to her desired action," Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 260-64 (1997), and that "[t]he requested relief would bring PETPO's members one important step closer to being able to use their property as they wish or to more efficiently provide government services to the residents of Cedar City." (PETPO's Mot. for Summ. J. at 5.)  The court agrees.

If PETPO is successful in this suit, the federal government will have no authority to regulate the take of the Utah prairie dog on non-federal land, whether through special rule 4(d) or the general rule 4(d).  Moreover, even though state law may still regulate the take of the Utah prairie dog in the absence of a federal regulation, the presence of an additional barrier to PETPO's ultimate desired result does not prevent the court from removing an initial barrier.  See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. at 260-64.  Consequently, PETPO has satisfied the redressability requirement and has standing in this case.

**Constitutional Authority to Adopt Special Rule 4(d)**

At the heart of the dispute between the parties in this case is whether one of the enumerated powers in the Constitution authorizes Congress–and, through congressional delegation, the FWA–to regulate take of the Utah prairie dog on non-federal land.  PETPO argues that no enumerated powers authorize Congress to regulate take of an animal that is purely intrastate and that has no commercial market.  Defendants concede that the Utah prairie dog is a purely intrastate animal, but contend that Congress is nevertheless authorized to regulate take of the prairie dog under the Commerce Clause and the Necessary and Proper Clause.

The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. 1, § 8. At one point in time, Congress' Commerce Clause power seemed to be virtually unlimited, leading one scholar to "wonder why anyone would make the mistake of calling it the Commerce Clause instead of the 'hey-you-can-do-whatever-you-feel-like clause.'" Judge Alex Kozinski, *Introduction to Volume 19*, 19 HARV. J. L. PUB. POL., 1, 5 (1995). This changed with the United States Supreme Court's rulings in United States v. Lopez, 514 U.S. 549 (1995) and United States v. Morrison, 529 U.S. 598 (2000).

In Lopez, the Court clarified that, although the categories are broad, there are only three "categories of activity that Congress may regulate under its commerce power." 514 U.S. at 558-59.

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce.

Id.

After articulating these categories, the Court examined whether the Commerce Clause authorized Congress to enact the Gun-Free School Zones Act of 1990–which forbade an individual from knowingly possessing a gun in a place that the individual knew, or had reason to believe, was a school zone. Id. Finding that the regulated activity (possessing a gun in a school zone) did not fit into any of the three categories, the Court ruled that the Act was unconstitutional. Id.

In <u>Morrison</u>, the Court clarified what it did in <u>Lopez</u>.  <u>Morrison</u>, 529 U.S. 598, 609-612.  Focusing its analysis purely on the third <u>Lopez</u> category, the Court stated that it had relied on four considerations when determining that the Commerce Clause could not authorize the gun possession law.  <u>Id.</u>  First, the gun possession law was non-economic and criminal in nature.  <u>Id.</u> at 610.  Second, "the statute contained 'no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.'"  <u>Id.</u> at 611 (quoting <u>Lopez</u>, 514 U.S. at 562).  Third, the act's legislative history did not contain any "express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." <u>Id.</u> at 611-12.  The Court clarified that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation."  <u>Id.</u> at 614.  Fourth, "our decision in <u>Lopez</u> rested in part on the fact that the link between gun possession and a substantial effect on interstate commerce was attenuated."  <u>Id.</u> at 612.  Relying on these same considerations, the Court ruled that the Commerce Clause did not authorize Congress to create a civil remedy for victims of gender-motivated crimes.  Consequently, the relevant parts of the Violence Against Women Act of 1994 were declared unconstitutional.

Because the parties in the present dispute agree that the first two <u>Lopez</u> categories do not apply, the court's analysis will focus solely on the third <u>Lopez</u> category.  Applying the relevant considerations as presented in <u>Morrison,</u> it is clear that the Commerce Clause does not authorize Congress to regulate takes of Utah prairie dogs on non-federal land.

The court agrees with PETPO's claim that the rule is non-economic because "the Service

is regulating every activity, regardless of its nature, if it causes harm to a Utah prairie dog." (PETPO's Mot. for Summ. J. at 24.)  Additionally, it is undisputed that the rule in question does not contain any jurisdictional element that would limit its reach to takes that have an explicit connection to interstate commerce.  (FWS' Mot. for Summ. J. at 12.)  It is also undisputed that there are no express congressional findings regarding the effects upon interstate commerce of taking a Utah prairie dog.  Id.  Finally, as will be demonstrated below, all of Defendants' arguments purporting to establish a link between Utah prairie dog takes and a substantial effect on interstate commerce are attenuated.

    Defendants' argument that the rule has a substantial effect on interstate commerce because it has frustrated several proposed agricultural and commercial activities misses the mark.  The proper focus of the "substantial effect" test is the "regulated activity."  See Gonzales v. Raich, 545 U.S. 1, 23 (2005).  Illustratively, the Supreme Court ruled that Congress could regulate the purely local growth and consumption of wheat or marijuana because those activities altered the national market for those commodities.  Raich, 545 U.S. 1; Wickard v. Filburn, 317 U.S. 111 (1942).  However, the Court ruled that Congress could not regulate the possession of a gun in a known school zone, even though the regulation of that activity affected commerce in a variety of ways (e.g. people could not sell guns in a school zone).  Lopez  514 U.S. 549 (1995); see also Morrison 529 U.S. 598 (2000).  In other words, the question in the present case is whether take of the Utah prairie dog has a substantial effect on interstate commerce, not whether the regulation preventing the take has such an effect.  Consequently, the fact that PETPO members or other persons are prohibited from engaging in commercial activities as a result of

special rule 4(d) is irrelevant to the Commerce Clause analysis.

Furthermore, Defendants' argument concerning the biological value of the Utah prairie dog is insufficient to demonstrate that take of the prairie dog has a substantial effect on interstate commerce. The Court acknowledges that the Utah prairie dog may have an effect on the ecosystem. Nevertheless, as aptly observed by Chief Judge Sentelle, "[T]he Commerce Clause empowers Congress 'to regulate commerce' not 'ecosystems.'" National Ass'n of Home Builders v. Babbitt, 327 U.S. App. D.C. 248, 272 (D.C. Cir. 1997) (Sentelle, J., dissenting). If Congress could use the Commerce Clause to regulate anything that *might* affect the ecosystem (to say nothing about its effect on commerce), there would be no logical stopping point to congressional power under the Commerce Clause. Accordingly, the asserted biological value of the Utah prairie dog is inconsequential in this case.

Defendants' arguments concerning the commercial value of the Utah prairie dog is also insufficient because the purported value is too attenuated to support the premise that take of the prairie dog would have a substantial effect on interstate commerce. Even if Defendants' presumption that "tourism websites would not feature a species that was of no interest to visitors" is true, there is no evidence that tourism in southern Utah would be negatively affected by takes of the Utah prairie dog on non-federal land. In fact, all of the websites cited by Defendants specifically refer to the animals' presence in national parks of forests.

The fact that scientific research has been conducted and books have been published about the Utah prairie dog is similarly too attenuated to establish a substantial relation between the take of the Utah prairie dog and interstate commerce. After all, scientific research has also been

conducted and books have also been published about both guns and women. Nevertheless, the Supreme Court ruled that federal regulation of gun possession and violence against women is beyond Congress' Commerce Clause power. See Morrison, 529 U.S. at 601-02, 613-17; Lopez, 514 U.S. at 560-66.

Finally, as stated by the U.S. Court of Appeals for the Fifth Circuit (which ultimately upheld Congress' authority to regulate takes of intrastate noncommercial species for different reasons), "[t]he *possibility* of future substantial effects of the [intrastate noncommercial species] on interstate commerce, through industries such as medicine, is simply too hypothetical and attenuated from the regulation in question to pass constitutional muster." GDF Realty Investments, Ltd. v. Norton, 326 F.3d 622, 638 (2003) (citing Morrison, 529 U.S. at 612).

Defendants' final argument, that the Necessary and Proper Clause authorizes special rule 4(d) because the rule is essential to the economic scheme created by the ESA, also fails upon close examination. This argument is based on the Supreme Court's ruling in Raich that a regulation may be upheld when it is an "essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 545 U.S. at 24-25.

Although the ESA itself regulates some economic activity, the rule in question is not necessary to the statute's economic scheme. Defendants emphasize that the Supreme Court cited the federal regulation of the take of bald and golden eagles as an example of congressional power that is clearly authorized by the Commerce Clause. (FWS' Mot. for Summ. J. at 21 (citing Raich, 545 U.S. at 26 n.36).) The Court's bald eagle example is not surprising because it

is consistent with the Court's ruling in Raich. 545 U.S. 1.

At issue in Raich was whether Congress was authorized to regulate the purely local growth and consumption of marijuana. Because it was clear that a national market for marijuana already exists, the Court found that Congress has the power to regulate activities that have a substantial effect on that market. Id. at 17-22. Such activities obviously include growing marijuana, which leads to a greater national supply of the product, as well as consuming it, which affects the national demand for the product. Congress was consequently authorized to regulate any growth or consumption of marijuana in the United States, including any such activity that occurs exclusively within one state. Id. If Congress was not able to regulate those local activities, its ability to regulate the national market would be frustrated. Id. The same is true with regulating takes of bald eagles because there is a national market for bald eagles and bald eagle products. If Congress is not authorized to regulate purely intrastate takes of bald eagles, its attempt to regulate the market for bald eagles will be frustrated.

The present case, on the other hand, differs significantly from Raich in one important way that makes any appeal to the Necessary and Proper Clause futile: takes of Utah prairie dogs on non-federal land–even to the point of extinction–would not substantially affect the national market for any commodity regulated by the ESA. The only evidence that suggests that the prairie dog's extinction would substantially affect such a national market is Defendants' assertion that golden eagles, hawks, and bobcats are "known to prey on prairie dogs." (FWS' Mot. for Summ. J. at 29.) However, Defendants do not claim that the Utah prairie dog is a major food source for those animals, and those animals are known to prey on many other rodents, birds,

and fish. In other words, there is no evidence that the diminution of the Utah prairie dog on private lands in Utah would significantly alter the supply or quality of animals for which a national market exists. Therefore, congressional protection of the Utah prairie dog is not necessary to the ESA's economic scheme.

The court also rejects Defendant's argument that the regulation of takes of Utah prairie dogs can be aggregated with the regulation of takes of every other intrastate non-commercial species to satisfy the Necessary and Proper Clause. The court sees no reason to consider such aggregation. PETPO is not asking the court to invalidate the regulation of takes of all intrastate non-commercial species on all lands, but just the regulation of takes of Utah prairie dogs on non-federal ground. Moreover, there is no evidence that the extinction of the Utah prairie dog would cause any other species to lose value or likewise become extinct. Although Congress might be authorized to unlimitedly regulate takes of intrastate non-commercial species whose extinction would subsequently cause the extinction of other species (especially the extinction of commercial species), that is simply not the case before the court. Instead, Defendants essentially ask the court to find that takes of Utah prairie dogs substantially affect interstate commerce solely because the prairie dog has been grouped with a number of other species, whose extinction also may or may not substantially affect interstate commerce. Such effect is far too attenuated to suggest that regulating takes of Utah prairie dogs is a necessary part of the ESA's economic scheme. Consequently, the court in this case declines to aggregate the regulation of takes of all intrastate non-commercial species.

For these reasons, the court finds that Congress has no authority to regulate takes of Utah

prairie dogs on non-federal land.

## SUMMARY AND CONCLUSION

Although the Commerce Clause authorizes Congress to do many things, it does not authorize Congress to regulate takes of a purely intrastate species that has no substantial effect on interstate commerce. Congress similarly lacks authority through the Necessary and Proper Clause because the regulation of takes of Utah prairie dogs is not essential or necessary to the ESA's economic scheme.

PETPO's Motion for Summary Judgment is GRANTED, with prejudice.

Defendants' Cross-Motion for Summary Judgment is DENIED, with prejudice.

IT IS SO ORDERED

DATED this 4th day of November, 2014.

_____

Dee Benson
United States District Judge