FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**March 29, 2017**

**TENTH CIRCUIT**

Elisabeth A. Shumaker
Clerk of Court

PEOPLE FOR THE ETHICAL
TREATMENT OF PROPERTY
OWNERS,

      Plaintiff-Appellee,

v.

UNITED STATES FISH AND
WILDLIFE SERVICE; DANIEL M.
ASHE, acting in his official capacity
as Director of the United States Fish
and Wildlife Service; NOREEN
WALSH, acting in her official
capacity as Regional Director of the
United States Fish and Wildlife
Service's Mountain-Prairie Region;
UNITED STATES DEPARTMENT OF
THE INTERIOR; RYAN ZINKE,*

      Defendants-Appellants,

and

FRIENDS OF ANIMALS,

      Intervenor Defendant-
      Appellant.

_____

Nos. 14-4151 & 14-4165

---

      *      Pursuant to Fed. R. App. P. 43(c)(2), recently confirmed Secretary of
the Department of Interior, Ryan Zinke, is substituted for former Secretary of the
Interior Sally Jewell.

DEFENDERS OF WILDLIFE; DAVID S.
COHEN; ERIC M. FREEDMAN;
STEPHEN GARDBAUM; STEPHEN
GOTTLIEB; M. ISABEL MEDINA;
STEVEN D. SCHWINN;
ENVIRONMENTAL LAW
PROFESSORS; WILLIAM C. BANKS;
NATIONAL ASSOCIATION OF HOME
BUILDERS; ANIMAL WELFARE
INSTITUTE; WYOMING
ASSOCIATION OF CONSERVATION
DISTRICTS; CENTER FOR
BIOLOGICAL DIVERSITY; WYOMING
FARM BUREAU FEDERATION;
HUMANE SOCIETY OF THE UNITED
STATES; SIERRA CLUB; WYOMING
STOCK GROWERS ASSOCIATION;
WILDEARTH GUARDIANS;
WYOMING WOOL GROWERS
ASSOCIATION; UTAH FARM
BUREAU FEDERATION; CATO
INSTITUTE AND PROFESSORS OF
CONSTITUTIONAL LAW; STATE OF
UTAH; STATE OF ALASKA; STATE
OF ARIZONA; STATE OF
COLORADO; STATE OF IDAHO;
STATE OF KANSAS; STATE OF
MONTANA; STATE OF SOUTH
DAKOTA; STATE OF WYOMING;
STATE OF MICHIGAN; CHAMBER OF
COMMERCE OF THE UNITED
STATES AND THE NATIONAL
FEDERATION OF INDEPENDENT
BUSINESS; MOUNTAIN STATES
LEGAL FOUNDATION;

UNITED STATES SENATORS MIKE
LEE, JAMES INHOFE, MIKE ENZI,
DAVID VITTER, TED CRUZ, AND
ORRIN HATCH AND CONGRESSMEN
JASON CHAFFETZ, CHRIS STEWART,
MIA LOVE, AND ROB BISHOP;
CENTER FOR CONSTITUTIONAL
JURISPRUDENCE,

    Amici Curiae.

---

**Appeals from the United States District Court
for the District of Utah
(D.C. No. 2:13-CV-00278-DB)**

---

Anna T. Katselas, Attorney (John C. Cruden, Assistant Attorney General, David
C. Shilton, and Mary Hollingsworth, Attorneys, of the U.S. Department of
Justice, Environment and Natural Resources Division, Washington, D.C., with
her on the briefs), for Defendants-Appellants.

Michael Ray Harris, of Friends of Animals, Wildlife Law Program, Centennial,
Colorado, for Intervenor Defendant-Appellant.

Jonathan Wood (M. Reed Hopper, with him on the brief), of Pacific Legal
Foundation, Sacramento, California, for Plaintiff-Appellee.

Jason C. Rylander  and Karimah Schoenhut of Defenders of Wildlife,
Washington, D.C., filed an amici curiae brief for Defenders of Wildlife, Animal
Welfare Institute, Center for Biological Diversity, Humane Society of the United
States, Sierra Club, and Wildearth Guardians, in support of Defendants-
Appellants.

David M. Driesen, Unversity Professor, of Syracuse University College of Law,
Syracuse, New York, filed an amici curiae brief for Constitutional Law
Professors William C. Banks, David S. Cohen, Eric M. Freedman, Stephen
Gardbaum, Stephen E. Gottlieb, M. Isabel Medina, and Steven D. Schwinn, in
support of Defendants-Appellants.

Daniel H. Lutz and Hope M. Babcock of Institute for Public Representation, Georgetown University Law Center, Washington, D.C., filed an amicus curiae brief for Environmental Law Professors in support of Defendants-Appellants.

Thomas J. Ward and Jeffrey B. Augello of National Association of Home Builders, Washington, D.C., and Norman D. James, Fennemore Craig, P.C., Phoenix, Arizona, filed an amicus curiae brief in support of Plaintiff-Appellee.

Karen Budd-Falen of Budd-Falen Law Offices, LLC, Cheyenne, Wyoming, filed an amici curiae brief for Wyoming Association of Conservation Districts, Wyoming Farm Bureau Federation, Wyoming Stock Growers Association, Wyoming Wool Growers Association, and Utah Farm Bureau Federation, in support of Plaintiff-Appellee.

Ilya Shapiro and Julio Colomba, of Cato Institute, Washington, D.C., filed an amici curiae brief for Cato Institute and Professors of Constitutional Law, in support of Plaintiff-Appellee.

Damien M. Schiff of Alston & Bird LLP, Sacramento, California, filed an amici curiae brief for United States Senators Mike Lee, James Inhofe, Mike Enzi, David Vitter, Ted Cruz, and Orrin Hatch and Congressmen Jason Chaffetz, Chris Stewart, Mia Love, and Rob Bishop in support of Plaintiff-Appellee.

Sean D. Reyes, Utah Attorney General, and Bridget K. Romano, Utah Solicitor General, Anthony L. Rampton and Kathy A.F. Davis, Assistant Utah Attorneys General, Salt Lake City, Utah, Craig W. Richards, Attorney General, Juneau, Alaska, Mark Brnovich, Attorney General, Phoenix, Arizona, Cynthia Coffman, Attorney General, Denver, Colorado, Lawrence G. Wasden, Attorney General, Boise, Idaho, Derek Schmidt, Attorney General, Topeka, Kansas, Tim Fox, Attorney General, Helena, Montana, Marty Jackley, Attorney General, Pierre, South Dakota, and Peter K. Michael, Attorney General, Cheyenne, Wyoming, filed an amici curiae brief for the States of Utah, Alaska, Arizona, Colorado, Idaho, Kansas, Montana, South Dakota, and Wyoming in support of Plaintiff-Appellee.

Steven J. Lechner of Moutain States Legal Foundation, Lakewood, Colorado, filed an amicus curiae brief for Mountain States Legal Foundation in support of Plaintiff-Appellee.

John C. Eastment, Anthony T. Caso, and Cristen Wohlgemuth of Center for Constitutional Jurisprudence, Orange, California, filed an amicus curiae brief for Center for Constitutional Jurisprudence in support of Plaintiff-Appellee.

William S. Consovoy and J. Michael Connolly of Consovoy McCarthy PLLC, Arlington, Virginia; Patrick Strawbridge of Consovoy McCarthy PLLC, Boston, Massachusetts; Kate Comerford Todd and Sheldon Gilbert of U.S. Chamber Litigation Center, Inc., Washington, D.C.; and Karen R. Harned and Luke A. Wake of NFIB Small Business Legal Center, Washington, D.C., filed an amici curiae brief for the Chamber of Commerce of the United States and the National Federation of Independent Business in support of Plaintiff-Appellee.

---

Before **HOLMES**, **McHUGH**, and **MORITZ**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

People for the Ethical Treatment of Property Owners ("PETPO") challenges a regulation promulgated by the United States Fish and Wildlife Service ("FWS" or "Service") pursuant to the Endangered Species Act ("ESA"). The challenged regulation prohibits the "take" of the Utah prairie dog, a purely intrastate species, on nonfederal land. The ESA defines "take" as meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19).

The district court granted summary judgment for PETPO on the ground that neither the Commerce Clause nor the Necessary and Proper Clause of the Constitution authorizes Congress to regulate take of the Utah prairie dog on nonfederal land. FWS and intervenor-defendant Friends of Animals ("FoA") appeal from that grant of summary judgment, arguing that the challenged regulation is authorized by both the Commerce Clause and the Necessary and Proper Clause, and that PETPO lacks standing. We hold that the district court

correctly concluded that PETPO has standing, but erred in concluding that Congress lacked authority under the Commerce Clause to regulate (and authorize the Service to regulate) the take of the Utah prairie dog.

# I

## A

The purpose of the ESA is to conserve endangered and threatened species and the ecosystems on which they depend. *See* 16 U.S.C. § 1531(b). In order to effectuate this purpose, Congress tasked two executive officers with jointly implementing the Act: the Secretary of the Interior and the Secretary of Commerce. *Id.* § 1532(15). They, in turn, delegated their implementation responsibilities to, respectively, FWS and the National Marine Fisheries Service.

The ESA expressly defines the objects of its protections, that is, both "endangered species" and "threatened species." An endangered species "is in danger of extinction throughout all or a significant portion of its range," except for insect species determined to be pests "present[ing] an overwhelming and overriding risk to man." *Id.* § 1532(6). A threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

To protect these categories of species, the ESA "authorizes the Secretary of the Interior to list domestic or foreign species as endangered or threatened." *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000) (citing 16 U.S.C. § 1533(a)–(b)). At least five factors are to be considered in listing a

species as endangered or threatened: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). "Once a species is so listed, it is afforded certain protections, and federal agencies assume special obligations to conserve, recover and protect that species." *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231.

The "cornerstone" of the ESA's protections is a section prohibiting the take of any endangered species without a permit or other authorization. *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (citing 16 U.S.C. § 1538(a)(1)(B)). Pursuant to 16 U.S.C. § 1533(d), the Secretary of the Interior is authorized to extend the statutory prohibitions on take of endangered species to threatened species. *See* 16 U.S.C. § 1533(d) ("The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife . . . ."). FWS extended that cornerstone take prohibition to protect *all* threatened species. *See* 50 C.F.R. § 17.31 ("General Rule 4(d)" or "General Rule"). More specifically, FWS's General Rule 4(d) prohibits the take of all species listed as threatened by incorporating as to those species the prohibitions applicable to endangered species under 50 C.F.R. § 17.21, except when FWS issues a specific rule for a particular threatened species. *See id.*; *see also* 50 C.F.R. § 17.21 (setting forth take and other

prohibitions with respect to endangered species).  In such cases, the specific rule, or "special rule," regarding the particular species takes precedence over General Rule 4(d), such that the General Rule's blanket prohibition on take of threatened species no longer applies to that species and the special rule governs instead. *See id.* § 17.31(c).

The Utah prairie dog is a threatened species whose take is regulated by a special rule.  The Utah prairie dog lives only in Utah and approximately seventy percent of the population is on nonfederal land.  Originally listed as an endangered species under the ESA, Amendments to Lists of Endangered Fish and Wildlife, 38 Fed. Reg. 14678-01, 14678 (June 4, 1973) (codified as amended at 50 C.F.R. § 17.11), the species was reclassified as threatened in 1984; at that time, the FWS issued a special rule to regulate its take, Final Rule to Reclassify the Utah Prairie Dog as Threatened, With Special Rule To Allow Regulated Taking, 49 Fed. Reg. 22330-01, 22330 (May 29, 1984) (codified as amended at 50 C.F.R. § 17.40(g)).  The special rule ("Special Rule 4(d)" or "Special Rule") was amended in 1991, Final Rule to Amend Special Rule Allowing Regulated Taking of the Utah Prairie Dog, 56 Fed. Reg. 27438-01, 27438 (June 14, 1991) (codified as amended at 50 C.F.R. § 17.40(g)), and again in 2012, Revising the Special Rule for the Utah Prairie Dog, 77 Fed. Reg. 46158-01, 46158 (Aug. 2, 2012) (codified at 50 C.F.R. § 17.40(g)).

Today, Special Rule 4(d) regulates the take of Utah prairie dog by limiting: (1) the permissible locations of such take to agricultural lands, properties within

0.5 miles of conservation lands, and "areas where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or burial sites[;]" (2) the permissible amount of such take; and (3) the permissible methods of such take.  50 C.F.R. § 17.40(g).  In addition, the Special Rule authorizes incidental take that occurs as part of standard agricultural practices.  *See id.* § 17.40(g)(5).

PETPO, a nonprofit organization, was founded by Utah "residents who suffer as a result of the regulation of Utah prairie dog take."  J.A. at 160 (Decl. of Derek Morton, filed Nov. 18, 2013).  PETPO is comprised of more than 200 "private property owners and other persons and entities subject to overly burdensome regulations," *id.*, who allege that they "have been prevented from building homes, starting small businesses, and, in the case of the local government, from protecting recreational facilities, a municipal airport, and the local cemetery from the Utah prairie dog's maleffects," Aplee.'s Br. at 3 (citations omitted).

**B**

PETPO filed the instant action against FWS under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, alleging that neither the Commerce Clause nor the Necessary and Proper Clause authorizes Congress to regulate take of the Utah prairie dog on nonfederal land.  PETPO requested both declaratory and injunctive relief against the regulation of Utah prairie dog take on

nonfederal land.  FoA filed a motion to intervene, and the district court granted the motion.

PETPO then moved for summary judgment.  FWS cross-moved for summary judgment, defending the constitutionality of the challenged regulation under both the Commerce Clause and the Necessary and Proper Clause and arguing that PETPO lacks standing.  The district court granted summary judgment for PETPO and denied summary judgment for FWS and FoA, concluding that: (1) PETPO has standing; (2) the Commerce Clause does not authorize Congress to regulate the take of a purely intrastate species (i.e., the Utah prairie dog) that has no substantial effect on interstate commerce; and (3) the Necessary and Proper Clause does not authorize Congress to regulate take of the Utah prairie dog because such regulation is not essential to the ESA's economic scheme.

FWS and FoA timely appealed.  They raise two arguments on appeal: (1) PETPO lacks standing; and (2) both the Commerce Clause and the Necessary and Proper Clause authorize Congress to regulate take of the Utah prairie dog on nonfederal land.  We hold that the district court correctly concluded that PETPO has standing, but erred in concluding that the challenged regulation is not authorized by the Commerce Clause.  In light of our Commerce Clause holding, we have no need to opine regarding the merits of the district court's Necessary and Proper Clause ruling, and do not do so.  We accordingly **reverse** and **remand** for entry of summary judgment for FWS and FoA.

**II**

10

First, we conclude that PETPO has standing to challenge the constitutionality of the regulation. We review issues of standing de novo. *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013). To demonstrate standing, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)). In making this showing at the summary-judgment stage, a plaintiff is not entitled to depend on "mere allegations"—rather, he must "'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).

The parties agree that the first two elements of standing are satisfied,[1] but FoA argues that the third element, redressability, is not. Specifically, FoA argues that PETPO's alleged injuries are not redressable because if the district court were to grant the requested relief and strike down Special Rule 4(d), the absence

---

[1] And we agree, too. PETPO members presented affidavits that they suffered injuries in fact (the first element), and that their injuries are fairly traceable to FWS through its regulation of Utah prairie dog take (the second element).

of a special rule regarding the Utah prairie dog would trigger General Rule 4(d) to govern take of that species, and the General Rule prohibits even more take than the Special Rule.  Thus, FoA argues that "even if PETPO succeeds [at invalidating Special Rule 4(d)], **stricter federal rules** [i.e., General Rule 4(d)] would come into play that would bar **all** take of prairie dog on private land." Aplt. FoA's Opening Br. at 12.

As a preliminary matter, FoA is correct that General Rule 4(d) prohibits more take than Special Rule 4(d) because under the General Rule, take is prohibited completely unless the party first obtains a permit.  *See* 50 C.F.R. § 17.31(a); *see also id.* § 17.21(a), (c).  In contrast, under the Special Rule, take of the Utah prairie dog is not prohibited completely, but regulated with regard to location, amount, and method.  *Id.* § 17.40(g).  Thus, while the General Rule prohibits all take of Utah prairie dog without a permit, the Special Rule carves out certain allowances for take without a permit.

However, the fact that the General Rule prohibits more take than the Special Rule is irrelevant for our purposes because PETPO's suit, in substance, attacks not any particular regulation but Congress's ability to authorize *any* regulation of Utah prairie dog take.  *See Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1271 (11th Cir. 2007) (considering Commerce Clause challenge to final rule listing the Alabama sturgeon as endangered under the theory that "Congress has exceeded the power granted to it under the Commerce Clause by authorizing protection of the Alabama Sturgeon").  To be

sure, in its briefing and at oral argument, PETPO curiously characterizes its claim as attacking the Special Rule and disclaims any attack on the ESA. But our standing inquiry must focus on the substance of PETPO's lawsuit. *See Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 494 (10th Cir. 1998) (focusing on "the substance of [the plaintiff's] complaint" and the fact that there was "no evidence in the record" to support her claim of standing). And, as a matter of logic, PETPO's wish to attack the regulation of prairie dog take on Commerce Clause and Necessary and Proper grounds implicates 16 U.S.C. § 1533(d), which grants authority to the Secretaries of the Interior and of Commerce to issue regulations extending the take prohibitions of § 1538(a)(1) to threatened species. *See* 16 U.S.C. § 1533(d). If Congress lacks such authority under the Commerce Clause or the Necessary and Proper Clause, then it stands to reason that § 1533(d) cannot authorize *any* regulation of prairie dog take, and FWS could not enforce either the general or specific rule.

An examination of PETPO's complaint, particularly the requested relief, clearly bears out this understanding of PETPO's claim. First, the relief requested would apply to both rules (as they pertain to take of Utah prairie dogs on nonfederal land). PETPO's requested relief is not limited to a particular FWS regulation; instead, both the declaratory and injunctive relief requested would expressly pertain to *any* federal prohibition on the take of Utah prairie dogs on nonfederal land. PETPO requests the following relief:

(1)    for a declaration that the prohibition of the take of the
Utah prairie dog on non-federal land is invalid under the [APA],
because it is inconsistent with constitutional right, power, privilege,
or immunity and not in accordance with law;

(2)    for a declaration that the prohibition of the take of the
Utah prairie dog is an invalid exercise of delegated legislative power
under the United States Constitution, and that the Service is without
authority to prohibit the take of the prairie dog on non-federal land;
[and]

(3)    for a permanent injunction preventing the Service from
enforcing the prohibition of the take of the Utah prairie dog on non-
federal land[.]

J.A. at 34.[2]  By its terms, the requested relief would apply equally to the prohibition of

Utah prairie dog take in General Rule 4(d) as to the prohibition of Utah prairie dog take

in Special Rule 4(d); that is, granting the relief that PETPO seeks would necessarily make

unenforceable *both* rules to the extent that they prohibit take of the Utah prairie dog on

nonfederal land.

Moreover, this conclusion is also consistent with how PETPO expressly framed its

claim for relief under the APA.  In its complaint, PETPO ended that claim by stating that

110.    No enumerated power supports the regulation of the
take of the Utah prairie dog on non-federal land.

111.    The regulation of the take of the Utah prairie dog on
non-federal land is neither necessary nor proper to the exercise of
any power of the federal government.

112.    Therefore, the regulation of the take of the Utah prairie
dog on non-federal land is contrary to constitutional right, power,
privilege, or immunity, 5 U.S.C. § 706(2)(B), as well as arbitrary,
capricious, and contrary to law, 5 U.S.C. § 706(2)(A).  The Service

---

[2]    PETPO also requests costs of litigation and "other relief as the Court
may deem just and proper."  J.A. at 35.

> has no authority to require PETPO's members to obtain a permit, or
> satisfy any other conditions, before taking the prairie dog on non-
> federal land.

J.A. at 32 (emphasis added).  This last sentence in particular shows that although the vehicle for this suit is an APA claim, the gist of PETPO's claim is that the Service does not have delegated authority to regulate the take of Utah prairie dogs because, under the Constitution, Congress has no such authority to delegate. Were PETPO to win on that claim and FWS nonetheless attempted to enforce the General Rule insofar as it prohibits prairie dog take, FWS could expect its enforcement activities to be justifiably enjoined by a district court.  Indeed, the district court here expressly understood this to be the question presented on the merits.  *See* J.A. at 200 ("At the heart of the dispute . . . is whether one of the enumerated powers in the Constitution authorizes Congress—and, through congressional delegation, [FWS]—to regulate take of the Utah prairie dog on non-federal land.") (Mem. Decision & Order, filed Nov. 5, 2014).

Further, it is unclear how a court could set aside the Special Rule's prohibition on take but not the General Rule's, because the Special Rule prohibits take only to the extent that it incorporates by reference the take prohibitions found in the General Rule.  *See* 50 C.F.R. § 17.40(g)(1) ("Except as noted in . . . this [Special Rule], all prohibitions of [General Rule 4(d)] . . . apply to the Utah prairie dog.").  In other words—with the sole exception of its incorporation of the General Rule's take prohibition—the Special Rule actually *permits* take only in certain locations, amounts, and methods.  Thus, we are satisfied that if PETPO

prevails on its claim that *Congress* lacks authority to prohibit take of the Utah prairie dog, neither FWS nor a private party bringing a citizen's suit could enforce any prohibition on Utah prairie dog take.[3]

For these reasons, the district court correctly concluded that PETPO has standing—more specifically, that its alleged injuries are redressable by its requested relief.

## III

## A

We now turn to the merits, where PETPO challenges FWS's prohibition on take of the Utah prairie dog on nonfederal land by arguing that Congress's authorization of this regulation is unconstitutional because neither the Commerce Clause nor the Necessary and Proper Clause grants Congress power to so regulate.[4]  In short, *if* Congress could not itself regulate take of the Utah prairie dog on nonfederal land, neither could it authorize the Secretary of the Interior to promulgate regulations so regulating the species.

---

[3]     And if we were to grant this requested relief, all sources of PETPO's alleged injuries would be eliminated.  *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261–64 (1997) (finding standing even though the requested relief removed only one barrier—zoning requirements—from construction of a housing development because the remaining barriers—such as financing—were mere "uncertainties" rather than "absolute barriers," which permitted the court to infer a "substantial probability" that the housing would be built if the zoning requirements were invalidated).

[4]     PETPO concedes that Congress has the power under the Property Clause, U.S. CONST. Art. IV, § 3, cl. 2, to regulate take of the Utah prairie dog on federal land.

The APA permits an aggrieved party to challenge and requires us to "hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity."[5]  5 U.S.C. § 706(2)(b); *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) ("[T]he APA contemplates, in the absence of a clear expression of contrary congressional intent, that judicial review will be available for colorable constitutional claims . . . .").  Although we generally grant considerable deference to agency action, "[w]e review de novo claims alleging constitutional abuse by an agency."  *Burke v. Bd. of Governors of Fed. Reserve Sys.*, 940 F.2d 1360, 1367 (10th Cir. 1991); *see also Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 802 (10th Cir. 2010) ("Because constitutional questions arising in a challenge to agency action under the APA 'fall expressly within the domain of the courts,' we review de novo whether agency action violated a claimant's constitutional rights." (quoting *Darden v. Peters*, 488 F.3d 277, 283–84 (4th Cir. 2007))); *cf. Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001) (applying constitutional avoidance in construing  statute rather than deferring to agency interpretation because a serious constitutional question was raised under the Commerce Clause by the agency's interpretation of statute); *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1249

---

[5]     We note that neither FWS nor FoA challenges PETPO's ability to use the APA to challenge the prohibition on take of Utah prairie dogs by asserting that such a prohibition exceeds Congress's power under the Commerce Clause. Indeed, with the exception of FoA's standing argument, the parties engage almost entirely on the merits of the Commerce Clause question.

(10th Cir. 2008) ("It is well established that the canon of constitutional avoidance does constrain an agency's discretion to interpret statutory ambiguities, even when *Chevron* deference would otherwise be due."); *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1231 (10th Cir. 1999) ("[D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions.").  Accordingly, we review de novo whether Congress lacks power under the Commerce Clause to authorize the prohibition of Utah prairie dog take.

**B**

We conclude that the district court erred in holding that the challenged regulation is not authorized under the Commerce Clause, which gives Congress authority "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. CONST. art. I, § 8, cl. 3.

**1**

The district court concluded that the Commerce Clause does not authorize the regulation because the regulated activity—i.e., take of the Utah prairie dog on nonfederal land—does not have a substantial effect on interstate commerce.  The court reasoned that: (1) take of the Utah prairie dog on nonfederal land is not commercial or economic activity, and the fact that the challenged regulation prohibits people "from engaging in commercial activities . . . is irrelevant," J.A. at 203–04; and (2) the value of the Utah prairie dog, whether biological,

commercial, scientific, or through potential future effects, has too attenuated an effect on interstate commerce, if any at all.

## 2

The Commerce Clause authorizes Congress to regulate three categories of activity: (1) "use of the channels of interstate commerce"; (2) "instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). "[T]he parties in the present dispute agree that the first two *Lopez* categories do not apply . . . ." J.A. at 202. Thus, we inquire only whether, under the third *Lopez* category, the activity regulated substantially affects interstate commerce. *See Lopez*, 514 U.S. at 558–59 (holding that "Congress' commerce authority includes the power to regulate those activities having a *substantial relation* to interstate commerce, *i.e.*, those activities that *substantially affect* interstate commerce" (emphases added) (citation omitted)).

To determine whether a regulated activity substantially affects interstate commerce, we ask "whether *Congress had a rational basis* to find that the regulated activity, taken in the aggregate, would substantially affect interstate commerce." *United States v. Patton*, 451 F.3d 615, 623 (10th Cir. 2006) (emphasis added). The Supreme Court has "stress[ed] that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a

19

'rational basis' exists for so concluding." *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (quoting *Lopez*, 514 U.S. at 557).

Under the third *Lopez* category, Congress has the "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17; *accord Taylor v. United States*, --- U.S. ----, 136 S. Ct. 2074, 2080 (2016). Consequently, "where *a general regulatory statute bears a substantial relation to commerce*, the *de minimis* character of individual instances arising under that statute is of no consequence." *Lopez*, 514 U.S. at 558; *see also Taylor*, 136 S. Ct. at 2079 ("[A]ctivities . . . that 'substantially affect' commerce . . . may be regulated so long as they substantially affect interstate commerce *in the aggregate*, even if their individual impact on interstate commerce is minimal." (emphasis added)); *Raich*, 545 U.S. at 23 (distinguishing between regulation that "f[alls] outside Congress' commerce power in its entirety" and regulation that constitutes an "individual application[] of a concededly valid statutory scheme"). As a result, the Supreme Court has made clear that "[t]he question . . . is whether Congress' . . . policy judgment, *i.e.,* its decision to include [a] narrower 'class of activities' within [a] larger regulatory scheme, was constitutionally deficient," or whether "the subdivided class of activities . . . was an essential part of the larger regulatory scheme." *Raich*, 545 U.S. at 26–27; *see also id.* at 28 ("The congressional judgment that an exemption for . . . a significant segment of the

total market would undermine the orderly enforcement of the entire regulatory scheme is entitled to a strong presumption of validity.").

Moreover, the Court has underscored that the fact that a regulated activity is noncommercial or "trivial by itself" is "not a sufficient reason for removing [it] from the scope of [otherwise valid] federal regulation."[6] *Raich*, 545 U.S. at 20; *see id.* at 17 ("[E]ven if appellee's activity be local and *though it may not be regarded as commerce*, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." (emphasis added) (quoting *Wickard v. Filburn*, 317 U.S. 111, 125 (1942))); *id.* at 22 ("That the regulation ensnares some purely intrastate activity is of no moment.  As we have done many times before, we refuse to excise individual components of that larger scheme."); *see also Taylor*, 136 S. Ct. at 2081 ("[I]t makes no difference under our cases that any actual or threatened effect on commerce *in a particular case* is minimal." (emphasis added)).

In short, the Commerce Clause authorizes regulation of noncommercial, purely intrastate activity that is an essential part of a broader regulatory scheme

---

[6]      In addition to arguing that the challenged regulation is constitutional under the *Raich* framework, FWS argues that the regulation substantially affects interstate commerce because the activity at which it is directed is commercial or economic in nature.  *See, e.g.*, *Patton*, 451 F.3d at 623 (noting that this criterion "determines whether the regulated activity falls within the definition of 'commerce.' If so, . . . there is a heavy—perhaps in reality irrebuttable—presumption that it affects more states than one, and falls within congressional power.").  However, we need not and do not reach this argument because, as we explain below, our holding under the *Raich* framework fully resolves this appeal.

that, as a whole, substantially affects interstate commerce (i.e., has a substantial relation to interstate commerce). Therefore, to uphold the challenged regulation here, we need only conclude that Congress had a rational basis to believe that such a regulation constituted an essential part of a comprehensive regulatory scheme that, in the aggregate, substantially affects interstate commerce.

**a**

We conclude that Congress had a rational basis to believe that regulation of the take of the Utah prairie dog on nonfederal land is an essential part of the ESA's broader regulatory scheme which, in the aggregate, substantially affects interstate commerce. We first examine the ESA's status as a comprehensive regulatory scheme substantially affecting commerce and then turn to whether Congress had a rational basis to believe that regulation of take of the Utah prairie dog on nonfederal land is an essential part of that scheme.

As a preliminary matter, PETPO argues that we must employ a substantial effects analysis with regard to regulation of take of the Utah prairie dog alone, not with respect to all species or the ESA generally. *See* Aplee.'s Br. at 27–31. Specifically, PETPO contends that its claim is like those presented in *Lopez* and *Morrison*, because PETPO facially challenges a provision rather than "an application to a particular subset of activity, as in *Raich*." *Id.* at 28. In essence, PETPO argues that because it characterizes its claim as a facial challenge to a regulatory provision, the concerns implicated in *Raich* do not apply and so we must engage in a straightforward substantial effects analysis as to the regulation

of take of the Utah prairie dog alone.  But this argument misconstrues the

standard that *Raich* establishes and the substance of the claim that PETPO

actually asserts.

As established *supra*, the real crux of PETPO's challenge is not a challenge

to any particular FWS regulation but to Congress's power to authorize regulation

of the Utah prairie dog.  Although PETPO is, in a sense, correct that the

prohibition on take of the Utah prairie dog is "a particular challenged provision,"

Aplee.'s Br. at 29, this prohibition finds its place within the broader regulatory

scheme of the ESA's protections of endangered and threatened species.  More

specifically, the prohibition at issue is an instance of Congress's broad

authorization to use regulations to extend the take protections that endangered

species enjoy to those listed as threatened.  *See* 16 U.S.C. § 1533(d).

PETPO points to no authority suggesting that a challenge such as this

should be considered under a narrow application of the substantial effects test

rather than the *Raich* comprehensive regulatory scheme framework.  PETPO

mischaracterizes FWS's and FoA's arguments as suggesting that the substantial

effects test must be applied "to an enactment as a whole, rather than a particular

challenged provision."  Aplee.'s Br. at 29.  In doing so, PETPO cites *Morrison*,

*Lopez*, and our own decision in *Patton*, arguing that in each case an individual

provision was examined despite the fact that it was part of a larger piece of

legislation.  *See id.* at 29–30.  But the legislation at issue in those cases did not

constitute comprehensive regulatory schemes such as the CSA in *Raich* or the

ESA in the present case.  The CSA "repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs."  *Raich*, 545 U.S. at 12.

In contradistinction to the CSA, the Court pointed to the Gun-Free School Zones Act of 1990 that *Lopez* struck down as being "at the opposite end of the regulatory spectrum."  *Id.* at 24; *see also Lopez*, 514 U.S. at 561 ("Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.").  Despite the fact that the Gun-Free School Zones Act of 1990 was part of a single, large enactment—the Crime Control Act of 1990, Pub. L. 101-647, 104 Stat. 4789—the Court had no difficulty recognizing that this broader enactment was not a comprehensive regulatory scheme, dealing as it did with subjects as diverse as international money laundering, child abuse, and victims' rights.  *See* 104 Stat. at 4789, 4792 (for example, Title I of the Crime Control Act of 1990 addresses international money laundering, while Title II is the Victims of Child Abuse Act of 1990).  Indeed, the Court in both *Lopez* and *Raich* looked past the larger enactment and characterized the Gun-Free School Zones Act as an independent statute.  *Lopez*, 514 U.S. at 561 ("Section 922(q) is a criminal statute . . . ."); *Raich*, 545 U.S. at 23 (describing the Gun-Free School Zones Act as "a brief,

single-subject statute"); *see also* Crime Control Act of 1990 § 1702, 104 Stat. at 4844 (containing the Gun-Free School Zones Act of 1990 in Title XVII of the enactment, bearing the heading, "General Provisions," which contains provisions concerning railroad police officers and the use of private prisons for federal prisoners, as well as a directive to the Sentencing Commission to produce a report on mandatory minimum sentences).

The prohibition against felon possession of body armor we dealt with in *Patton* and the Violence Against Women Act of 1994 that *Morrison* addressed are equally distinguishable from comprehensive regulatory schemes such as the CSA or ESA. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 2, 108 Stat. 1796, 1796–1807 (table of contents of the enactment containing the Violence Against Women Act as one of thirty-three separate titles addressing a variety of subjects); 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 1(b), 116 Stat. 1758, 1758–62 (2002) (table of contents of the enactment containing the James Guelff and Chris McCurley Body Armor Act of 2002 along with, *inter alia*, provisions addressing appropriations for the Department of Justice, drug treatment and prevention, and the Boys and Girls Clubs of America). That all of these laws were passed as parts of larger congressional enactments is immaterial under *Raich*, which concerns comprehensive regulatory regimes.

PETPO concedes that because "all classes of activities can be subdivided to find that they don't substantially affect interstate commerce, excising a particular

party's activity could potentially subject the Commerce Clause to death by a thousand cuts." Aplee.'s Br. at 28. Although the language of "excising *a particular party's activity*" is at least not linguistically congruent with *Raich*, which speaks of "individual instances of [a] class," 545 U.S. at 17, 23, we would do well to heed the danger that PETPO itself warns us about. Application of the rule that PETPO suggests would lead to just such a lingering death for the ESA—and likely for other regulatory schemes—insofar as every individual regulation passed within a larger regulatory scheme would be subject to a narrowly applied substantial effects test—a result that *Raich* directly forecloses. It should not surprise then, that every circuit to have addressed the constitutionality of take prohibitions under the ESA has, in effect, rejected such an approach.

More specifically, every federal appellate court that has addressed whether the ESA is a comprehensive scheme substantially affecting commerce has aggregated its effects on all threatened and endangered species.[7] *See San Luis &*

---

[7]    While it is true that many of these cases concern the *statutory* protections granted to species listed as endangered rather than prohibitions established by agency rulemaking, that distinction is immaterial for the *Raich* analysis, insofar as species are also listed as endangered by rulemaking. *See* 50 C.F.R. § 17.11 (listing endangered and threatened wildlife). Indeed, one case, *Alabama-Tombigbee Rivers Coalition*, expressly dealt with a challenge to the decision to list a species as endangered, not the application of the statutory protections to that species. *See* 477 F.3d at 1271–72 ("The Coalition's third contention is that the Final Rule should be vacated because Congress has exceeded the power authorized to it under the Commerce Clause by authorizing protection of the Alabama sturgeon, which the Coalition characterizes as an intrastate, noncommercial species."). Indeed, PETPO itself concedes that the fact that here "the activity is regulated under a regulation rather than a statutory provision" amounts to "a distinction without a difference." Aplee.'s Br. at 28.

*Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1175–76 (9th Cir. 2011)

("Pursuant to *Raich*, when a statute is challenged under the Commerce Clause,

courts must evaluate the aggregate effect of the statute (rather than an isolated

application) in determining whether the statute relates to 'commerce or any sort

of economic enterprise.' . . . We and other courts have discussed at length why

the protection of threatened or endangered species implicates economic

concerns."); *Ala.-Tombigbee Rivers Coal.*, 477 F.3d at 1273 ("If the process of

listing endangered species is 'an essential part of a larger regulation of economic

activity,' then whether that process 'ensnares some purely intrastate activity is of

no moment.' . . . The [ESA] prohibits all interstate and foreign commerce in

endangered species." (quoting *Raich*, 545 U.S. at 24)); *GDF Realty Invs., Ltd. v.

Norton*, 326 F.3d 622, 639 (5th Cir. 2003) (determining whether "the larger

regulation [is] directed at activity that is economic in nature" and noting that

"ESA's protection of endangered *species* dtw10 is economic in nature" and that

"ESA's drafters were concerned by the 'incalculable' value of the genetic

heritage that might be lost absent regulation," as well as observing that the

majority of takes of species "result from economic activity" (emphasis added));

*Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1046 (D.C. Cir. 1997)

("[W]e may look not only to the effect of the extinction of the individual

endangered species at issue in this case, but also to the aggregate effect of the

extinction of all similarly situated endangered species."); *cf. Markle Interests,

L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 475–77 (5th Cir. 2016)

(aggregating all ESA critical-habitat designations and upholding FWS

designation of private, purely intrastate land for purely intrastate frog species

under the Commerce Clause).

PETPO next argues that the ESA "is a comprehensive scheme to provide

for environmental conservation, not [to] regulate a market."  Aplee.'s Br. at 38.[8]

---

[8]      PETPO appears to proceed under the theory that *Raich* implicates not the Commerce Clause alone but also the Necessary and Proper Clause, insofar as this argument appears in the section of its brief on the Necessary and Proper clause.  *See* Aplee.'s Br. at 31–41.  The district court appears to have operated under a similar assumption, holding as it did that the prohibition on take of the Utah prairie dog was "not necessary to the ESA's economic scheme."  J.A. at 207.

In *Raich*, the Court stated that a comprehensive regulatory scheme that substantially affects interstate commerce is "well within [Congress's] authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce . . . among the several States.'"  545 U.S. at 22 (quoting U.S. CONST. art. I, § 8).  In upholding the constitutionality of the statute at issue in that case, however, the Court analyzed only Commerce Clause jurisprudence to conclude that the regulatory scheme substantially affected interstate commerce; the Court did not conduct a separate inquiry under the Necessary and Proper Clause.  Only Justice Scalia's concurring opinion in *Raich*, joined by no other justice, squarely considered the case as implicating the Necessary and Proper Clause.  *See* 545 U.S. at 34 (Scalia, J., concurring in the judgment) (opining that the substantial effects analysis of intrastate activities "derives from the Necessary and Proper Clause").  Further, we have before recognized that *Raich* is concerned with the third prong of traditional Commerce Clause analysis: "The Supreme Court's decisions in *Lopez*, *United States v. Morrison*, and *Raich* all hinged on interpretation of the third category of [Commerce Clause analysis]."  *Patton*, 451 F.3d at 623 (citation omitted).  *But see United States v. Carel*, 668 F.3d 1211, 1219 (10th Cir. 2011) (suggesting that *Raich* is a Necessary and Proper Clause case).

Because PETPO seemingly understands *Raich* to be a Necessary and Proper Clause case, its arguments relevant to *Raich* appear in that section of its brief.  While we perform our *Raich* analysis under the Commerce Clause, we present and address PETPO's arguments—irrespective of where they are found in its

This argument rests on the premise that, under *Raich*,[9] Congress may only reach intrastate activity "which, if beyond [Congress's] grasp, would frustrate a comprehensive regulatory scheme's ability to function *as a regulation of commerce*." *Id.* at 32 (emphasis added) (citing, *inter alia*, *Raich*, 545 U.S. at 22). But this premise is flawed and improperly narrows the standard that *Raich* establishes.

As an initial matter, the passage that PETPO cites from *Raich* as support for this argument concerns whether a rational basis exists for believing that regulation of intrastate activity was essential to the CSA, not whether the comprehensive scheme of the CSA itself involved the regulation of commerce. 545 U.S. at 22 ("[W]e have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."). Further, the Ninth Circuit has persuasively rejected such a narrow reading of *Raich*. Specifically, in *San Luis & Delta-Mendota Water Authority*, the court rejected the argument that the ESA does not have a "substantial effect" on interstate

---

briefing—insofar as they are relevant to that analysis. We would also note that were we to proceed instead under the assumption that *Raich* was decided under the Necessary and Proper Clause, our ultimate conclusion—that the prohibition on take of the Utah prairie dog is constitutional—would remain unchanged.

[9]    PETPO also cites *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 132 S. Ct. 2566, 2591–92 (2012) for this proposition, but the cited portion of Chief Justice Robert's opinion was joined by no other member of the Court.

commerce because, unlike the Controlled Substance Act upheld in *Raich*, it "is not a 'comprehensive *economic* regulatory scheme.'" *San Luis*, 638 F.3d at 1177 (emphasis added). The Ninth Circuit explained that "[t]he Supreme Court has never required that a statute be a 'comprehensive *economic* regulatory scheme' or a 'comprehensive regulatory scheme *for economic activity*' in order to pass muster under the Commerce Clause. Indeed, it has never used those terms." *Id.* The court continued that "[t]he only requirement—which was expressly detailed in *Raich*—is that the 'comprehensive regulatory scheme' have a 'substantial relation to commerce.'" *Id.* (quoting *Raich*, 545 U.S. at 17). We agree with the Ninth Circuit on this, and so consider whether the ESA has a substantial relation to interstate commerce, and conclude that it does.

PETPO wisely does not even attempt to dispute this; the substantial relationship between the ESA and interstate commerce is patent. First, regulation of take of endangered and threatened species is directly related to—indeed, arguably inversely correlated with—economic development and commercial activity. *See* 16 U.S.C. § 1531(a)(1) (Congress's finding and declaration of purpose that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation"); H.R. Rep. No. 93-412 (1973), *reprinted in* A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980 [hereinafter *A Legislative History of the Endangered Species Act*], at 141 (1982) ("The threat to animals may arise from a variety of sources; principally pollution, destruction of habitat and the

pressures of trade.").  In other words, the necessity of putting into place the ESA's protections was engendered in part by the excesses of commerce, and the statute acts as a brake on economic activity, as confirmed by the harms that underlie PETPO's standing.

Second, Congress's purposes in enacting the ESA were to conserve species by restricting commerce and to promote *long-term* commerce by conserving species.  *See* H.R. Rep. No. 93-412, *reprinted in A Legislative History of the Endangered Species Act*, at 144–45 (describing how the profit motive can incentivize the conservation of species and the potential for unknown commercial uses should engender appropriate caution, "[t]he institutionalization of that caution lies at the heart of [the ESA]"); *cf.* S. Rep. No. 91-526, at 3 (1969), *as reprinted in* 1969 U.S.C.C.A.N. 1413, 1415 (stating that the protections offered by a predecessor to the ESA could "permit the regeneration of [an exploited] species to a level where controlled exploitation can be resumed," thus creating "profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels"). Thus, while the ESA's prohibitions may act as a *short-term* brake on economic activity, the statutory scheme was intended to promote commercial activity in the long run.

And third, the ESA's prohibitions help fuel an illegal wildlife trade that generates $5–8 billion annually—an illegal market second in size only to the illegal narcotics market.  Because "Congress' power to regulate commerce includes the power to prohibit commerce," whether the targeted market "is a lawful market that Congress sought to protect and stabilize" or "an unlawful market that Congress sought to eradicate" "is of no

constitutional import." *Raich*, 545 U.S. at 19 n.29. These are salient reasons why the ESA substantially affects interstate commerce.

Next, we conclude that Congress had a rational basis to believe that providing for the regulation of take of purely intrastate species like the Utah prairie dog is essential to the ESA's comprehensive regulatory scheme. Approximately sixty-eight percent of species that the ESA protects exist purely intrastate;[10] thus, piecemeal excision of purely intrastate species would severely undercut the ESA's conservation purposes.[11] Put another way, excising purely intrastate species "would leave a gaping hole in the" ESA. *Raich*, 545 U.S. at 22; *see also Ala.-Tombigbee Rivers Coal.*, 477 F.3d at 1275 ("Because a species' scientific or other commercial value is not dependent on whether its habitat straddles a state line, Congress had good

---

[10] FWS generated this estimate and PETPO has not challenged it. We discern nothing in the record that calls into doubt its accuracy.

[11] PETPO argues that "there's no reasonable basis to conclude that" the government's inability to regulate take of the Utah prairie dog "would frustrate the government's ability to regulate the market for any commodity." Aplee.'s Br. at 35. But this argument is based on the same narrow reading of *Raich* that we rejected *supra*. The relevant question is not whether the inability to regulate take of the Utah prairie dog alone would undermine the ESA but whether the inability to regulate take of intrastate species more generally would undermine the ESA. *See, e.g.*, *GDF Realty Invs.*, 326 F.3d at 640 (concluding that "Cave Species takes may be aggregated with all other ESA takes" because otherwise the ESA would be undermined given "the interdependence of species [that] compels the conclusion that regulated takes under ESA do affect interstate commerce"). Applying *Raich* narrowly to the FWS's prohibition of take of the Utah prairie dog, rather than more generally to the statutory authorization for such take regulations with respect to purely intrastate species, leads to a "death by a thousand cuts" of the ESA, to use PETPO's colorful phrase. Aplee.'s Br. at 28.

reason to include all species within the protection of the Act. It did not behave irrationally by taking the broader approach.").

Every one of our sister circuits that has addressed this issue has agreed that regulation of purely intrastate species is an essential part of the ESA's regulatory scheme. *See GDF Realty*, 326 F.3d at 640 (concluding that regulation of purely intrastate Cave Species takes "is an essential part of" ESA's larger regulatory scheme); *Gibbs*, 214 F.3d at 487 ("This regulation [prohibiting take of red wolves] is also sustainable as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" (quoting *Lopez*, 514 U.S. at 561)); *see also Markle Interests*, 827 F.3d at 476–78 (upholding FWS critical-habitat designations—in that case, of purely intrastate land for a purely intrastate species—under the Commerce Clause because such regulation is an essential part of ESA's regulatory scheme); *Ala.-Tombigbee*, 477 F.3d at 1274 ("Just as it is apparent that the 'comprehensive scheme' of species protection contained in the Endangered Species Act has a substantial effect on interstate commerce, it is clear that the listing process is 'an essential part' of that 'larger regulation of economic activity.'" (quoting *Raich*, 545 U.S. at 22, 24)). We agree with these courts that Congress had a rational basis to conclude that providing for the protection of purely intrastate species is essential to the ESA's comprehensive regulatory scheme.

And, having reached such a determination, courts appear to be led ineluctably to conclude that Congress has authority under the Commerce Clause to regulate purely intrastate species, including regulating the take thereof, under the ESA—either through a particular application of the ESA itself or through an agency regulation as here.  *See Markle Interests*, 827 F.3d at 476–78 (upholding designation of private, intrastate land as critical habitat for a purely intrastate frog species under the Commerce Clause as an essential part of ESA's comprehensive regulatory scheme); *San Luis & Delta-Mendota Water Auth.*, 638 F.3d at 1174–77 (upholding regulation of take of purely intrastate, noncommercial delta smelt as essential part of ESA's comprehensive regulatory scheme); *Ala.-Tombigbee Rivers Coal.*, 477 F.3d at 1271 (upholding regulation of purely intrastate, noncommercial Alabama sturgeon as essential part of ESA's comprehensive regulatory scheme); *GDF Realty Invs., Ltd.*, 326 F.3d at 638–41 (upholding regulation of take of purely intrastate Cave Species as essential to ESA's comprehensive regulatory scheme); *Gibbs*, 214 F.3d at 488, 492–98 (holding that take of forty-one purely intrastate red wolves is economic activity that substantially affects interstate commerce, and that regulation of that take is an essential part of ESA's comprehensive regulatory scheme); *see also Nat'l Ass'n of Home Builders*, 130 F.3d at 1052–57; *see also id.* at 1058 (Henderson, J., concurring) (stating that regulation of take of a purely intrastate fly species substantially affects interstate commerce by preventing loss of biodiversity and regulating interstate commercial development).  Indeed, the facts of many of

these cases closely track the present case, insofar as they concern challenges to regulation under the ESA of activity on nonfederal land.  *See Markle Interests*, 827 F.3d at 458–59; *GDF Realty Invs., Ltd.*, 326 F.3d at 624–26; *Gibbs*, 214 F.3d at 489; *Nat'l Ass'n of Home Builders*, 130 F.3d at 251.

Finding the foregoing authority persuasive, we likewise conclude that the regulation on nonfederal land of take of a purely intrastate species, like the Utah Prairie dog, under the ESA is a constitutional exercise of congressional authority under the Commerce Clause.  And if Congress could itself regulate take of the Utah prairie dog on nonfederal land, it could also constitutionally authorize the Secretary of the Interior to promulgate regulations to achieve this end.  Because we uphold this regulatory exercise under an enumerated power, the Commerce Clause, we need not consider its constitutionality under the Necessary and Proper Clause.  "[I]f it is not necessary to decide more, it is necessary not to decide more."  *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004), *quoted in Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1094 (10th Cir. 2010) ("Judicial restraint, after all, usually means answering only the questions we must, not those we can.").

### III

In sum, we **REVERSE** and **REMAND** with instructions to enter judgment for FWS and FoA.

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**
**OFFICE OF THE CLERK**
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker                                                      Chris Wolpert
Clerk of Court                    March 29, 2017                    Chief Deputy Clerk


Mr. Jared Carl Bennett
Office of the United States Attorney
District of Utah
111 South Main Street, Suite 1800
Salt Lake City, UT 84111

Ms. Jennifer Best
Friends of Animals
7500 East Arapahoe Road
Centennial, CO 80112

Professor Michael Ray Harris
Wildlife Law Program
7500 East Arapahoe Road, Suite 385
Englewood, CO 80112

Ms. Mary Hollingsworth
U.S. Department of Justice
Wildlife & Marine Resource Section
601 D Street Northwest
Washington, DC 20004

Ms. Anna Katselas
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
L'Enfant Plaza Station
Washington, DC 20044

Mr. David C. Shilton
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, DC 20044-0663

RE:    **14-4151, 14-4165, People for Ethical Treatment v. U.S. Fish & Wildlife, et al**
       Dist/Ag docket: 2:13-CV-00278-DB

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in these matters. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeals are a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

                                        Sincerely,

                                        *Elisabeth A. Shumaker*

                                        Elisabeth A. Shumaker
                                        Clerk of the Court


cc:      Hope M. Babcock
         Mark Brnovich
         Karen Budd-Falen
         Anthony T. Caso
         Jeffrey A. Chanay
         Cynthia H. Coffman
         William Consovoy
         Kathy A. Davis
         Dennis David DeWald
         David Driesen
         John C. Eastman
         Timothy C. Fox
         M. Reed Hopper
         Norman Daniel James
         Steven J. Lechner
         Aaron Lindstrom

Daniel Harold Lutz
Charles David McGuigan
Peter Kenneth Michael
Matt A. Munson
James Odenkirk
Anthony L. Rampton
Craig W. Richards
Bridget K. Romano
Jason Craig Rylander
Damien M. Schiff
Derek Schmidt
Karimah Schoenhut
Dale Schowengerdt
Ilya Shapiro
Clay R. Smith
Lawrence G. Wasden
Brittany Lynn Wilson
Cristen Wohlgemuth
Jonathan Wood
Frederick Richard Yarger

EAS/kf